**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OREGON NATURAL DESERT
ASSOCIATION; WESTERN
WATERSHEDS PROJECT; NORTHWEST
ENVIRONMENTAL DEFENSE CENTER;
OREGON WILD; CENTER FOR
BIOLOGICAL DIVERSITY; FRIENDS OF
OREGON'S LIVING WATERS,
        *Plaintiffs-Appellants,*

    and

FOREST GUARDIANS,
        *Plaintiff,*

    v.

UNITED STATES FOREST SERVICE,
        *Defendant-Appellee.*

No. 08-35205

D.C. No.
07-CV-000634-KI

OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, District Judge, Presiding

Argued and Submitted
October 20, 2008—Portland, Oregon

Filed December 11, 2008

Before: David R. Thompson, A. Wallace Tashima, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

16295

**COUNSEL**

David H. Becker and Peter M. Lacy, Oregon Natural Desert Association; Daniel P. Mensher, Pacific Environmental Advocacy Center; Kristin F. Ruether, Advocates for the West, for the plaintiffs-appellants.

Ronald J. Tenpas, Assistant Attorney General; Russell Young and Lisa E. Jones, United States Department of Justice Envi-

ronment & Natural Resources Division, for the defendant-
appellee.

---

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Plaintiffs-Appellants, Oregon Natural Desert Association,
Western Watersheds Project, Northwest Environmental
Defense Center, Oregon Wild, Center for Biological Diver-
sity, and Friends of Oregon's Living Waters (collectively
ONDA), sued Defendant-Appellee, the United States Forest
Service (Forest Service), for allegedly failing to comply with
§ 401 of the Clean Water Act (CWA, or Act) in its issuance
of grazing permits on Forest Service lands. 33 U.S.C. § 1341.[1]
ONDA specifically argued that the outcome and reasoning of
*S.D. Warren Co. v. Maine Board of Environmental Pro-
tection*, 547 U.S. 370 (2006), are clearly irreconcilable with
our reasoning in *Oregon Natural Desert Ass'n v. Dombeck,*
172 F.3d 1092 (9th Cir. 1998), and that *Dombeck* is, there-
fore, no longer controlling law.

The Forest Service moved for judgment on the pleadings
pursuant to Federal Rules of Civil Procedure 12(c). The mat-
ter was referred to a magistrate judge, who made Findings and
Recommendations suggesting that the district court grant the
motion for judgment on the pleadings on the ground that
ONDA's claim was barred by the doctrine of collateral estop-
pel. The district court adopted the Findings and Recommen-
dations and granted the motion for judgment on the pleadings.
This appeal followed. We have jurisdiction to review this
decision under 28 U.S.C. § 1291, and we affirm.

---

[1]We cite to the original Act throughout this opinion, and provide a par-
allel citation to the U.S. Code only the first time we cite each CWA provi-
sion. *See Our Children's Earth Found. v. EPA*, 527 F.3d 842, 845 n.1 (9th
Cir. 2008).

## BACKGROUND

### A.   Statutory Background

The CWA was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101; 33 U.S.C. § 1251(a). The CWA requires, among other things, that

> [a]ny applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate.

*Id.* § 401(a)(1). Any such discharge must also comply with other provisions in the CWA that establish effluent limitations and national performance standards. *Id.* (citing CWA §§ 301-303, 306, 307; 33 U.S.C. §§ 1311-1313, 1316, 1317).

The parties in this case dispute the meaning of the word "discharge," as used in § 401. ONDA claims that "discharge" includes "pollutants" emitted by grazing livestock in the form of sediment, fecal coliform, and fecal streptococci. The Forest Service responds that because cattle do not fall under the definition of "point sources," they are not covered under § 401.

The CWA does not define "discharge," but states that "[t]he term 'discharge' when used without qualification includes a discharge of a pollutant, and a discharge of pollutants." *Id.* § 502(16); 33 U.S.C. § 1362(16). The Act further defines "discharge of a pollutant" and "discharge of pollutants" to mean "(A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft."

§ 502(12). Finally, the Act defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." § 502(14). All other sources of pollution are characterized as "nonpoint sources." *See Or. Natural Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 849 n.9 (9th Cir. 1987) ("Nonpoint source pollution is not specifically defined in the Act, but is pollution that does not result from the 'discharge' or 'addition' of pollutants from a point source.").

The CWA's disparate treatment of discharges from point sources and nonpoint sources is an organizational paradigm of the Act. From the passage of the Act, Congress imposed extensive regulations and certification requirements on discharges from point sources, but originally relied almost entirely on state-implemented planning processes to deal with nonpoint sources, later amending the Act in 1987 to include more federal review of nonpoint sources. *Id.* §§ 208, 319; 33 U.S.C. §§ 1288, 1329; *see also* William L. Andreen, *Water Quality Today — Has the Clean Water Act Been a Success?*, 55 ALA. L. REV. 537, 545 n.42 (2004). Congress primarily focused its regulation under the Act on point sources, which tended to be more notorious and more easily targeted, in part because nonpoint sources were far more numerous and more technologically difficult to regulate. *See* S. REP. NO. 92-414, at 39 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 3674 (acknowledging that "many nonpoint sources of pollution are beyond present technology of control"); 118 CONG. REC. 10611, 10765 (1972), *reprinted in* 1 LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972, at 8 (1973) (noting that "we do not have the technology" to deal with nonpoint sources in the same way as industrial pollution).

## B.  Factual and Procedural Background

On February 23, 2006, the Forest Service issued federal term grazing permit # 01825 authorizing the Colvin Cattle Company (Colvin) to graze cattle within the boundaries of the Lower Middle Fork Allotment on the Malheur National Forest. The Forest Service did not require Colvin to obtain a certificate from the State of Oregon prior to issuing the permit.

On April 26, 2007, ONDA,[2] along with six other environmental conservation groups, filed suit against the Forest Service alleging violation of CWA § 401. The complaint alleged that "[t]he Forest Service's authorized grazing has resulted in, and continues to result in, significant short- and long-term damage to riparian resources and stream habitat throughout the Middle Fork John Day River basin." Further, it alleged that "[l]ivestock grazing is an activity that may cause discharges into navigable waters," hence "[t]he Forest Service violated [CWA § 401] by issuing federal grazing permit # 01825 when the applicant failed to provide certification from the state." The Forest Service denied the allegations contained in the complaint, and countered with affirmative defenses sounding in principles of res judicata and collateral estoppel.

Over ten years prior, in 1994, ONDA and two other groups filed a substantially identical claim against the Forest Service concerning the issuance of a grazing permit within the Malheur National Forest. *See Or. Natural Desert Ass'n v. Thomas*, 940 F. Supp. 1534, 1537 (D. Or. 1996). ONDA sought a declaratory judgment requiring applicants for federal grazing permits to receive state certification "as a necessary precondition to the issuance of that permit." *Id.* at 1536-37. After analyzing the meaning of "discharge" in § 401, the Oregon district court concluded that "the plain meaning of 'discharge' does not restrict the definition to point sources or

_____

[2]In this portion of the discussion, ONDA refers only to the individual organization, not the collective Plaintiffs-Appellants.

nonpoint sources with conveyances." *Id.* at 1540. The district court rejected the Forest Service's argument that its interpretation of § 401 should receive deference, indicating that "[e]ven though nonpoint sources are not mentioned in the 1972 amendments, the court cannot construe that Congress intended to preclude their application to § 401." *Id.* at 1541. The district court subsequently granted ONDA's motion for declaratory judgment. *Id.* The Forest Service appealed.

On appeal, this court reversed the district court, holding that "the language and structure of the [CWA indicate] that the certification requirement of [§ 401] was meant to apply only to point source releases." *Dombeck*, 172 F. 3d at 1094. Citing Ninth Circuit precedent, the court noted certain limitations of the Act.

> In 1972, Congress passed the Clean Water Act, which made important amendments to the water pollution laws. The amendments place certain limits on what an individual firm could discharge . . . The Act thus banned only discharges from point sources. The discharge of pollutants from nonpoint sources — for example, the runoff of pesticides from farmlands — was not directly prohibited. The Act focused on point source polluters presumably because they could be identified and regulated more easily that [sic] nonpoint source polluters.

*Id.* at 1096 (quoting *Natural Res. Def. Council v. EPA*, 915 F.2d 1314, 1316 (9th Cir. 1990)). The court further found that a cow is not a point source under the CWA, because it is "inherently mobile," and therefore directed the district court to enter judgment in favor of the Forest Service. *Id.* at 1099. The Supreme Court denied ONDA's petition for a writ of certiorari on November 1, 1999. 528 U.S. 964 (1999).

In light of the foregoing procedural history, the Forest Service responded to ONDA's 2007 complaint with a motion for

judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) based on the argument that ONDA was barred by principles of collateral estoppel and res judicata. The magistrate judge found that the two lawsuits did not involve the same claim for the purposes of res judicata because of the amount of time that had passed between issuance of the two permits. However, he recommended that ONDA's claim be barred under the doctrine of collateral estoppel because the parties had actually litigated the dispute over § 401 in *Thomas* and *Dombeck*, and the Forest Service had prevailed.

The magistrate judge further found that the parties joining ONDA who had not been party to the earlier cases were barred under the doctrine of virtual representation. The magistrate judge reasoned that ONDA had sufficiently represented the interests of the newly added plaintiffs in the earlier suit because the two suits presented an identical issue.

The district court adopted the magistrate's Findings and Recommendations and granted the Forest Service's motion for judgment on the pleadings. ONDA subsequently appealed to this court on the theory that the outcome and reasoning of *S.D. Warren Co.* are clearly irreconcilable with our reasoning in *Dombeck,* making a finding of collateral estoppel inappropriate. ONDA also asserted that the theory of virtual representation had been disavowed by the Supreme Court, and could not serve as a basis for disposing of any portion of this suit.

## STANDARD OF REVIEW AND JURISDICTION

We review the district court's grant of judgment on the pleadings de novo. *Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 929 (9th Cir. 2008). On review, we "accept all material allegations in the complaint as true and construe them in the light most favorable to [the nonmoving party]." *Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004) (alterations in original). This court may affirm the district court's

grant of summary judgment "on any basis supported by the record." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1043 (9th Cir. 2002). We have jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

ONDA's principal argument in this case is that "discharge," as used in § 401 of the CWA, should be read to include the discharge of pollutants from nonpoint sources, such as livestock grazing. Although this court has previously limited its interpretation of "discharge" to effluents from point sources, *Dombeck*, 172 F.3d at 1098, ONDA[3] argues that the outcome and reasoning of *S.D. Warren* are clearly irreconcilable with our reasoning in *Dombeck,* and that, accordingly, Forest Service permits for cattle grazing are subject to state certification under § 401, because they may result in a "discharge." We analyze this claim first to determine whether the principles of *stare decisis* apply to bar ONDA's claim. If so, there is no need to reach the issues of collateral estoppel or virtual representation.

### A.   Stare Decisis and Supervening Authority

**[1]** Typically, we are bound by earlier published decisions of our court. However, circuit precedent may be effectively overruled by subsequent Supreme Court decisions that are closely on point, even if the precedent is not expressly overruled. *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1123 (9th Cir. 2002). In such circumstances, a panel may rule in contradiction to circuit precedent even without en banc review. We have held that "the issues decided by the higher court need not be identical in order to be controlling." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). As long as "the reasoning or theory of [the] prior circuit authority is clearly irreconcilable with the reasoning or theory of inter-

---

[3]ONDA is again used in the collective sense to represent all Plaintiffs-Appellants.

vening higher authority," the panel may consider the prior circuit opinion as "having been effectively overruled." *Id.* at 893. ONDA argues that the outcome and reasoning of *S.D. Warren* are clearly irreconcilable with our reasoning in *Dombeck*.

1.   The Ruling in *S.D. Warren*

The S. D. Warren Company (Company), which operates several hydroelectric power dams along the Presumpscot River in Maine, sought renewal of federal licenses for five of its dams. *S.D. Warren*, 547 U.S. at 374. Before receiving the requested license renewals, the Company was compelled to obtain water quality certifications from the Maine Department of Environmental Protection, which it did under protest. *Id.* at 374-75. The Maine agency required, as a condition of certification, that the Company maintain a minimum stream flow, and the federal licenses reflected those conditions. *Id.* at 375. The Company appealed the conditions placed on the licenses to the Maine state courts, contending that because its dams did not create or permit "discharges," it was not required to obtain state certification under § 401. *Id.*

The superior court ruled against the Company, and the Company appealed to the Supreme Judicial Court of Maine, which affirmed. 868 A.2d 210 (Me. 2005). The United States Supreme Court then granted certiorari. 546 U.S. 933 (2005). The question presented in the petition for writ of certiorari was: "Does the mere flow of water through an existing dam constitute a 'discharge' under Section 401, 33 U.S.C. § 1341, of the Clean Water Act, despite this Court's holding last year in [*South Florida Water Management District v.*] *Miccosukee* [*Tribe of Indians*, 541 U.S. 95 (2004),] that a discharge requires the addition of water from a distinct body of water?" Petition for Writ of Certiorari*, S.D. Warren*, 547 U.S. 370 (No. 04-1527).

**[2]** Before the Supreme Court, the Company argued that "because the release of water from the dams adds nothing to

the river that was not there above the dams," there was no "discharge" within the meaning of § 401. *Id.* at 379. In other words, because the Company was not adding anything to the water as it moved through its turbines, it could not be said to be discharging into the Presumpscot River. The Supreme Court rejected the notion that "an addition is fundamental to any discharge," and affirmed the Supreme Judicial Court of Maine on the ground that a "discharge" means a "flowing or issuing out," and does not require any addition to the water as it leaves the dam. *Id.* at 377. In sum, the United States Supreme Court held that the term "discharge" is not limited to the "discharge of a pollutant," but may also include the "flowing or issuing out" of non-pollutants, or even water.

[3] The parties to this action agree that *S.D. Warren* is not precisely on point. In *S.D. Warren*, no one questioned whether a "point source" existed for the purpose of determining whether a "discharge" had occurred. The movement of water at issue in *S.D. Warren* was achieved by each dam creating a pond and running the water through turbines back into the waterbed. These turbines are undeniably point sources under the CWA definition. *See* CWA § 502(14). Indeed, the Company contended on appeal, and the State of Maine did not disagree, that it was "undisputed that 401 does not cover non-point source . . . pollution." Transcript of Oral Argument at 5, *S.D. Warren*, 547 U.S. 370 (No. 04-1527). The issue in *S.D. Warren* was narrowly tailored to determine whether a discharge from a point source could occur absent addition of any pollutant to the water emitted from the dam turbines.[4]

---

[4]ONDA argues that we should not read *S.D. Warren* to pertain only to point sources because neither the Supreme Court nor this court has unequivocally held that a dam is a point source. ONDA also notes that § 304(f) of the CWA includes "changes caused by the construction of dams" under the classification of "nonpoint sources of pollution." 33 U.S.C. § 1314(f).

Other circuits have linked dams to nonpoint sources of pollution. The Sixth Circuit has recognized that the "EPA has consistently treated dams

**[4]** ONDA urges us to read *S.D. Warren* as expanding the meaning of "discharge" in § 401 to include discharge from nonpoint sources. However, the holding in *S.D. Warren* is limited to the conclusion that a discharge need not involve pollutants, hence the expulsion of water from a dam turbine is a discharge. Not only does *S.D. Warren* fail to address the issue of nonpoint source pollution, it confirms our conclusion in *Dombeck* that " '[d]ischarge' is the broader term because it includes all releases from point sources, whether polluting or nonpolluting." 172 F.3d at 1098.

## 2. The Reasoning of *S.D. Warren*

**[5]** The reasoning in *S.D. Warren* is likewise easily reconcilable with our reasoning in *Dombeck*. ONDA argues that because the Supreme Court was able to look beyond the definitions in the statute to include "non-pollutants" within the meaning of "discharge," we should also include nonpoint sources within the meaning of "discharge" in § 401. However, while the Supreme Court's interpretation is supported by the legislative history of the CWA, ONDA's recommended construction of the CWA is not.

---

as nonpoint sources of pollution." *United States ex rel. TVA v. Tenn. Water Quality Control Bd.*, 717 F.2d 992, 999 (6th Cir. 1983). The D.C. Circuit has also recognized "congressional intent [in § 304(f)] that some water quality changes caused by dams be regulated as nonpoint pollution." *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 177 (D.C. Cir. 1982).

ONDA observes that in cases where a dam has been held to be a point source, our court has simply accepted the parties' stipulation to that effect. *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993). Even if ONDA's observation is generally accurate, its argument is not dispositive concerning the facts in *S.D. Warren* because, while a dam might not always be considered a point source, the dam turbines that were the focus of the decision in *S.D. Warren* clearly were a point source. 547 U.S. at 373. *See also Gorsuch*, 693 F.2d at 165 n.22 ("The pipes or spillways through which water flows from the reservoir through the dam into the downstream river clearly falls within [the definition of point source].").

**[6]** The Supreme Court noted in *S.D. Warren* that the purpose of the CWA went beyond controlling the "addition of pollutants" to also deal with "pollution" generally, including " 'the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water.' " 547 U.S. at 385 (quoting CWA § 502(19)); *see also* CWA § 101(b). The Court referred to findings by *amici* that dams cause chemical modifications to the water that disrupt aquatic life forms, as well as findings by the Maine courts that the Company's dams blocked passage of eels and sea-run fish, and prevented recreational access to and use of the river. 547 U.S. at 385-86. The Court ruled that these changes in the river went to the core of the CWA's purpose, and were of the type intended by the CWA to be subject to State certification. *Id.* at 386. Therefore, "[r]eading § 401 to give 'discharge' its common and ordinary meaning preserves the state authority apparently intended" under the CWA. *Id.*

**[7]** In contrast, nonpoint sources of pollution have not generally been targeted by the CWA; instead they are generally excluded from CWA regulations, except to the extent that states are encouraged to promote their own methods of tracking and targeting nonpoint source pollution. It is generally understood among students of the CWA that "[w]hile Congress could have defined a 'discharge' to include generalized runoff as well as the more obvious sources of water pollution, . . . it chose to limit the permit program's application to the latter [point source] category." 55 ALA L. REV. at 562. *See also* Marc R. Poirier, *Non-point Source Pollution*, *in* ENV'L L. PRACTICE GUIDE § 18.13 (2008).

**[8]** The reason for the CWA's focus on point sources rather than nonpoint sources is simply that "[d]ifferences in climate and geography make nationwide uniformity in controlling non-point source pollution virtually impossible. Also, the control of non-point source pollution often depends on land use controls, which are traditionally state or local in nature." Poirier, *Non-point Source Pollution*, § 18.13. Instead, § 208 and

then § 319 were designated by Congress as methods to keep states accountable for identifying and tracking nonpoint sources of pollution, as well as identifying "the best management practices and measures" to reduce such pollution. CWA § 319(b)(2)(A).

In summary, while many scholars recognize the harmful effects of nonpoint source pollution, they also recognize that the CWA does not generally exercise jurisdiction over those nonpoint sources.

> [U]nlike the permitting and enforcement provisions for point sources, [under the CWA] EPA lacks direct implementation or regulatory authority in the face of nonexistent or inadequate state implementation. At most, under the nonpoint source control provisions, EPA is authorized to withhold grant funding for delinquent states. This policy judgment appears consistent with Congress's reluctance, as expressed in sections 101(b) and (g) of the Act, to allow extensive federal intrusion into areas of regulation that might implicate land and water uses in individual states.

Robert W. Adler, *The Two Lost Books in the Water Quality Trilogy: The Elusive Objectives of Physical and Biological Integrity*, 33 ENVTL. L. 29, 56 (2003).

**[9]** Neither the ruling nor the reasoning in *S.D. Warren* is inconsistent with this court's treatment of nonpoint sources in § 401 of the Act, as explained in *Dombeck*. Accordingly, the principles of *stare decisis* apply, and this court need not revisit the issue decided in *Dombeck*. As every first-year law student knows, the doctrine of *stare decisis* is often the determining factor in deciding cases brought before any court. The doctrine of *stare decisis* is "the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Vasquez v. Hillery*, 474 U.S. 254, 265 (1986). The doctrine helps to

ensure that "bedrock principles are founded in the law rather than in the proclivities of individuals." *Id.*

Although *stare decisis* does not control the outcome of every case, the Supreme Court has noted that "detours from the straight path of *stare decisis* in our past have occurred for articulable reasons, and only when the Court has felt obliged 'to bring its opinions into agreement with experience and with facts newly ascertained.' " *Id.* at 266 (quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 412 (1932) (Brandeis, J. dissenting)); *see also Arizona v. Rumsey*, 467 U.S. 203, 212 (1984) ("any departure from the doctrine of *stare decisis* demands special justification"). When, as in this case, there are neither new factual circumstances nor a new legal landscape, *stare decisis* is an appropriate basis for our decision.

## B.   Collateral Estoppel and Virtual Representation

**[10]** Because we conclude that the principles of *stare decisis* control all of the plaintiffs in this case, we need not reach the issues of collateral estoppel and virtual representation. Whether or not the individual Plaintiffs-Appellants in this case were participants in the earlier trial, they are bound by *Dombeck* as a matter of law. Accordingly, the district court's grant of the Forest Service's motion for judgment on the pleadings as to all Plaintiffs-Appellants is AFFIRMED.

**AFFIRMED.**