PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AES SPARROWS POINT LNG, LLC;
MID-ATLANTIC EXPRESS, LLC,

*Petitioners,*

v.

SHARI T. WILSON, Secretary of the
Maryland Department of the
Environment; MARYLAND
DEPARTMENT OF THE ENVIRONMENT,

*Respondents.*

No. 09-1539

On Petition for Review of an Order
of the Maryland Department of the Environment.
(FERC Docket Nos. CP07-62-000; CP07-63-000;
CP07-64-000; CP07-65-000)

Argued: September 24, 2009

Decided: December 22, 2009

Before TRAXLER, Chief Judge, HAMILTON,
Senior Circuit Judge, and Mark S. DAVIS,
United States District Judge
for the Eastern District of Virginia, sitting by designation.

Petition for review denied by published opinion. Senior Judge
Hamilton wrote the opinion, in which Chief Judge Traxler
joined. Judge Davis wrote a concurring opinion.

**COUNSEL**

**ARGUED**: Jeffrey A. Lamken, BAKER BOTTS, LLP, Washington, D.C., for Petitioners. Adam Dean Snyder, OFFICE OF THE ATTORNEY GENERAL OF MARY-LAND, Baltimore, Maryland, for Respondents. **ON BRIEF:** G. Mark Cook, Jessica A. Fore, Adam J. White, Emil J. Barth, BAKER BOTTS, LLP, Washington, D.C., for Petitioners. Douglas F. Gansler, Attorney General of Maryland, Emily A. Vainieri, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Respondents.

---

**OPINION**

HAMILTON, Senior Circuit Judge:

Pursuant to § 19(d)(1) of the Natural Gas Act, 15 U.S.C. § 717r(d)(1), we are petitioned by AES Sparrows Point LNG, LLC and Mid-Atlantic Express Holdings, LLC (collectively AES) to review the State of Maryland Department of the Environment's denial of a request for water quality certification pursuant to § 401(a)(1) of the Clean Water Act, 33 U.S.C. § 1341(a)(1), with respect to a proposed large-scale liquefied natural gas marine import terminal and pipeline project. For the reasons that follow, we deny the petition for review.

I.

A.   The Project.

This case involves a proposal by AES to construct and operate a liquefied natural gas (LNG) marine import terminal at Sparrows Point (a heavily industrialized area adjacent to Baltimore Harbor) and an eighty-eight-mile pipeline connect-

ing the terminal to three interstate natural gas pipelines in Eagle, Pennsylvania (the Project). "LNG, which is natural gas that has been cooled to -260? Fahrenheit to form a liquid, occupies one six-hundredth of the volume of natural gas in its gaseous state." *AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120, 123-24 (4th Cir. 2008). The Project

> would receive LNG, store it, and regasify it for transportation and delivery to residential, commercial, and industrial end users. Because LNG can be economically transported by sea from gas-producing areas worldwide to many domestic and foreign markets, LNG import terminals are typically sited in coastal areas with shipping access to foreign countries.

*Id.* at 124.

The Project involves three different aspects, each of which raises different environmental concerns. Many of these concerns derive from the fact that the water and sediments around Sparrows Point are already contaminated by past industrial use and fail to meet Maryland water quality standards. First, in order to accommodate the LNG tankers, the Project requires dredging an approximately 118-acre turning basin and approach channel within Baltimore Harbor to forty-five feet of depth. One environmental concern of such dredging is that dissolved oxygen levels in the additional deep channel areas would drop below Maryland water quality standards, rendering aquatic life virtually impossible.

The second aspect of the Project is the terminal itself, which includes facilities to process the approximately 3.7 million cubic yards of contaminated material to be dredged from the harbor. The processing of the dredged material as called for under the Project involves both the de-watering of the dredged spoil and the mixing of the de-watered spoil with Portland cement and other additives in an effort to bind the

contaminants within the processed dredged material (the PDM). Depending on the success of that process in preventing the leaching of historical contaminants, AES hopes to make the PDM available as fill material for mine reclamation projects, construction fill, and other development projects, with placement in land fills as a secondary option.

The final aspect of the Project is the installation of a natural gas pipeline, thirty inches in diameter and approximately eighty-eight miles long, from Baltimore Harbor to Eagle, Pennsylvania, where the pipeline would connect with three existing interstate pipelines. Among other things, the pipeline would cross streams and wetlands in Maryland, raising concerns regarding the destruction of aquatic habitat and water quality through sedimentation.

B.   Relevant Statutes and Agencies Involved in Authorizing the Project.

The Natural Gas Act, 15 U.S.C. §§ 717 to 717z, requires a party seeking to construct a LNG terminal to obtain authorization from the Federal Energy Regulatory Commission (FERC). *Id.* § 717b(a). In order to do so, applicants must comply with the Natural Gas Act's requirements as well as complete FERC's extensive pre-filing process. 18 C.F.R. § 157.21. FERC must then consult with the appropriate state agencies on numerous state and local issues. 15 U.S.C. § 717b-1(b).

FERC carries out reviews under the Natural Gas Act and the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f, and, as the statutorily designated "lead agency," coordinates other agencies' reviews related to a LNG project under other applicable statutes. 15 U.S.C. § 717n(b)(1). The FERC docket serves as a central conduit and repository for information requests and responses and is the foundation for the consolidated record for petitions for review, such as this

one, concerning water quality certifications under the Clean Water Act. 15 U.S.C. § 717n(d).

The Army Corps of Engineers (the Corps) issues authorizations pursuant to § 404 of the Clean Water Act, 33 U.S.C. § 1344, and § 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, to conduct dredging in navigable waters of the United States and to discharge dredged and fill materials into jurisdictional wetlands and waters. Other federal agencies participated in FERC's review of the Project, with comments being submitted by the United States Environmental Protection Agency, the National Oceanic and Atmospheric Administration, and the United States Fish & Wildlife Service. The Maryland Department of the Environment (Maryland) is charged with reviewing the Project under the Coastal Facilities Review Act, Md. Code Ann., Envir. §§ 14-501 to 14-511, and § 401(a)(1) of the Clean Water Act.

C.   The Review Process.

1.   Maryland's Initial Review.

Of relevance to the present petition for review, on January 8, 2007, AES submitted its request to Maryland for water quality certification under § 401(a)(1) of the Clean Water Act (AES's Request for § 401(a)(1) Water Quality Certification or AES's § 401(a)(1) Certification Request). Both on May 7 and August 15, 2007, Maryland notified AES that its § 401(a)(1) Certification Request was incomplete and identified additional information needed for processing the request. AES submitted information in response to each notification. Continuing to deem AES's § 401(a)(1) Certification Request incomplete, Maryland requested further additional information from AES on January 23, 2008. AES responded with a series of submissions, the last of which it submitted on April 14, 2008.

### 2.   The Corps' Initial Review.

During the same time frame, the Corps undertook its review of AES's application for a dredging and discharge permit under § 404 of the Clean Water Act and § 10 of the Rivers and Harbors Act of 1899. Like Maryland, the Corps made a series of requests to AES for additional information in order to make AES's application complete. Having received AES's final response to its data requests in April 2008, on April 25, 2008, the Corps issued a public notice of AES's application for a dredging and discharge permit under § 404 of the Clean Water Act and § 10 of the Rivers and Harbors Act of 1899 for review and comment. In relevant part, the public notice stated:

> For [Corps] permitting purposes, the applicant is required to obtain a Water Quality Certification in accordance with Section 401 of the [Clean Water Act] from [Maryland] and the Pennsylvania Department of Environmental Protection (PDEP). The [Corps] hereby requests that [Maryland] and PDEP review the proposed discharges for compliance with the applicable water quality standards. **The Section 401 certifying agencies have a statutory limit of one year in which to make their decisions.**

73 Fed. Reg. 24276-02, 24277 (May 2, 2008) (emphasis added).

### 3.   FERC's Initial Review.

The April 25, 2008 public notice was jointly issued with FERC and also announced the availability of the Draft Environmental Impact Statement (the Draft EIS) for review and comment.

4. Maryland, the Corps, and FERC's Continued Review.

On June 15, 2008, Maryland submitted comments to FERC regarding the Draft EIS, concerning a number of different aspects of the Project, including the creation of anoxic/hypoxic areas caused by the deep-dredging of the turning basin.[1] The Corps submitted comments on the Draft EIS as well. On December 5, 2008, FERC published for review and comment the final Environmental Impact Statement for the Project (the Final EIS). In official comments on the Final EIS directed to FERC, Maryland and the Corps repeated many of their earlier concerns regarding deficiencies in certain areas of information.

On January 15, 2009, FERC adopted the Final EIS and issued its order approving the Project under the Natural Gas Act (the FERC Order). Issuance of the FERC Order, however, did not end the regulatory review process. By letter dated February 6, 2009, the Corps informed AES that, due to outstanding information about the ultimate disposal of the PDM, the final pipeline alignment and crossing methodologies, and the Project's impact on endangered species, the Corps was not in a position to finalize its review. The Corps also stated "that based on information currently in the administrative record, it would be difficult for the project to receive a favorable determination from the Corps if the decision needs to be made within the designated Federal agency decision timeframe of 90 days from release of the FEIS (*i.e.*, by March 5, 2009)." (J.A. 2288).

---

[1]Anoxic is an adjective meaning "greatly deficient in oxygen." *Merriam-Webster's Collegiate Dictionary* 48 (10th ed. 1999). Hypoxic is an adjective derived from the term "hypoxia," which term means "a deficiency of oxygen reaching the tissues of the body." *Id.* at 572.

5.   Further events with respect to the Corps' Review.

Faced with the prospect of a permit denial, AES requested that the Corps, pursuant to 33 C.F.R. § 325.2(d)(3)(v), suspend its processing of its § 404 permit application so that AES could provide the outstanding information. The Corps declined to suspend its review, but determined that, in accordance with 33 C.F.R. § 325.2(d)(5), AES's § 404 permit application is "hereby withdrawn from active status and will be held in abeyance pending resolution of these [outstanding] issues and your written request to have the Corps resume evaluation of this permit application." (J.A. 2482).

6.   Further events with respect to Maryland's Review.

On April 24, 2009, Maryland denied, in writing, AES's Request for § 401(a)(1) Water Quality Certification on the overall basis that it was "unable to conclude that, on this record, the Project will be carried out in compliance with Maryland water quality standards." (J.A. 6). Maryland expressly identified four independent and alternative grounds for the denial: (1) AES had not demonstrated that the PDM "will ultimately be managed to ensure compliance with water quality standards," (J.A. 2); (2) the Project would create additional deep water areas where dissolved oxygen levels would fail to meet Maryland water quality standards; (3) AES had not provided final surveyed plans for all wetland and stream crossings; and (4) until interagency consultations under § 7 of the Endangered Species Act of 1973, 16 U.S.C. § 1536, have been completed, Maryland could not conclude that the Project is consistent with Maryland water quality standards. Maryland noted, however, that it would continue its review of the Project under the Coastal Facilities Review Act and would reconsider its denial of AES's Request for § 401(a)(1) Water Quality Certification "upon [AES's] fulfillment of the above information/consultation requirements." (J.A. 6).

D.   Petition for Review.

In the present action, AES petitions us for review of Maryland's denial of its 401(a)(1) Certification Request. 15 U.S.C. § 717r(d)(1) ("The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a . . . State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law . . . .").

## II.

As a threshold matter, we first address Maryland's claim that, as a sovereign, it is immune from defending its denial of AES's § 401(a)(1) Certification Request in this court. Not surprisingly, AES responds that Maryland waived any potential claim of sovereign immunity in connection with the present petition for review by expressly consenting to defending, in federal court, its decision to deny AES's § 401(a)(1) Certification Request. *Virginia v. Reinhard*, 568 F.3d 110, 115 (4th Cir. 2009) ("[A] state may waive its sovereign immunity if it consents to suit in federal court."), *petition for cert. filed*, (U.S. Oct. 28, 2009) (No. 09-529). In this regard, AES points to the following language in Maryland's written decision denying AES's § 401(a)(1) Certification Request: "Pursuant to § 717r(d)(1) of the Natural Gas Act, 15 U.S.C. § 717r(d)(1), AES has the right to seek review of this decision through a civil action filed with the United States Court of Appeals for the Fourth Circuit." (J.A. 6).

We agree with AES. A State may waive its immunity to suit in federal court "in the context of a particular federal program." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985). While the test for determining whether a State has

waived its immunity from suit in federal court is a stringent one, we conclude that the test has been met here. A State will only be held to have waived its sovereign immunity from suit in federal court when the "waiver is 'stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction.'" *Reinhard*, 568 F.3d at 116 (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)). At a minimum, the language upon which AES relies leaves no room for any other reasonable construction than that Maryland consented to defending its denial of AES's Request for § 401(a)(1) Water Quality Certification before this court, pursuant to 15 U.S.C. § 717r(d)(1). Frankly, we find Maryland's assertion to the contrary disingenuous. Moreover, common sense compels the conclusion that if Maryland did not intend the above quoted language to represent its consent to defend its decision before this court, it would not have proceeded to specify in such decision that "[t]he record for any such review would be the consolidated record maintained by [FERC] . . . ." (J.A. 6). In conclusion, we reject Maryland's claim to sovereign immunity and proceed to address the merits of Maryland's denial of AES's § 401(a)(1) Certification Request.

### III.

The parties agree that our review of the merits of Maryland's denial of AES's § 401(a)(1) Certification Request is limited to the grounds set forth in the Administrative Procedure Act (the APA), 5 U.S.C. §§ 701 to 706. *Cf. Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (claims challenging federal agency action under the Clean Water Act are subject to judicial review under the APA). Under the APA, we are to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our review will follow this standard.

IV.

AES first challenges Maryland's denial of its § 401(a)(1) Certification Request as untimely, and therefore, not in accordance with law. In this regard, AES argues that Maryland waived the water quality certification requirements of § 401(a)(1) of the Clean Water Act with respect to the Project by failing to grant or deny its § 401(a)(1) Certification Request within the one-year waiver period set forth in the same statutory section. AES's argument is without merit.

In relevant part, § 401(a)(1) of the Clean Water Act provides:

> If the State . . . fails or refuses to act on a request for [water quality] certification, within a reasonable period of time (**which shall not exceed one year**) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State . . . ."

33 U.S.C. § 1341(a)(1) (emphasis added).

With respect to the date the one-year waiver period commenced regarding AES's § 401(a)(1) Certification Request, AES first contends that it commenced on January 9, 2007, the date Maryland first received such request. Alternatively, AES contends that, at the latest, the one-year waiver period commenced on April 14, 2008, the date of its last submission in response to Maryland's last request for additional information, prior to Maryland's decision denying AES's § 401(a)(1) Certification Request on April 24, 2009. Maryland's denial of AES's § 401(a)(1) Certification Request did not occur within

one year of January 9, 2007, or April 14, 2008. In support of its contentions, AES cites the language of § 401(a)(1) providing that the waiver period begins "after receipt of [a] request" for water quality certification under § 401(a)(1). AES also points out that, in 1987, FERC changed its interpretation of § 401(a)(1)'s waiver language from an interpretation considering the waiver period to commence on the date the certifying agency "deem[s] an application acceptable for processing," *Washington County Hydro Dev. Assocs.*, 28 FERC (CCH) 61,341, 61,624 (September 18, 1984), to an interpretation considering the waiver period to commence on "the date the certifying agency received a written request for certification," 18 C.F.R. § 4.34(b)(5)(iii)(2009) (formerly 18 C.F.R. § 4.38(e)(2) (1991)).[2] According to FERC, its prior practice of deeming the one-year waiver period to commence from the date the certifying agency deems the request acceptable for processing, "fails to enforce the clear text of the waiver provision of the [Clean Water Act] and subjects a license applicant to the possibility that a section 401 certification proceeding may be protracted beyond one year, in contravention of the statutory objective of preventing such delay." 52 Fed. Reg. 5446-01, 5447 (Feb. 23, 1987).

In response, Maryland argues that the one-year waiver period did not begin until April 25, 2008. This is the date that FERC and the Corps issued a joint public notice to advertise, *inter alia*: (1) the availability of the Draft EIS; (2) the fact that AES had applied for a § 404 permit with respect to the Project; and (3)

> For [Corps] permitting purposes, the applicant is required to obtain a Water Quality Certification in accordance with Section 401 of the [Clean Water

---

[2]FERC's interpretation of § 401(a)(1)'s waiver language pertains to an application for water quality certification in connection with an application for a FERC hydroelectric license. 52 Fed. Reg. 5446 (February 23, 1987).

Act] from [Maryland and Pennsylvania]. The [Corps] hereby requests that [Maryland] and [Pennsylvania] review the proposed discharges for compliance with the applicable water quality standards. The Section 401 certifying agencies have a statutory limit of one year in which to make their decisions.

73 Fed. Reg. 24276-02, 24277 (May 2, 2008).

All of this brings us to the question of whether the one-year waiver period began to run on April 25, 2008, such that Maryland's April 24, 2009 denial of AES's Certification Request was timely. In answering this question, we first consider the regulation promulgated by the Corps governing its processing of § 404 permit applications:

> No permit will be granted until required certification has been obtained or has been waived. A waiver may be explicit, or will be deemed to occur if the certifying agency fails or refuses to act on a request for certification within sixty days after receipt of such a request unless the district engineer determines a shorter or longer period is reasonable for the state to act. **In determining whether or not a waiver period has commenced or waiver has occurred, the district engineer will verify that the certifying agency has received a valid request for certification**.

33 C.F.R. § 325.2(b)(1)(ii) (emphasis added). In the joint public notice, the Corps declared that Maryland had one year from April 25, 2008 to consider AES's § 401(a)(1) Certification Request. By necessary implication, the Corps determined that, as of April 25, 2008, AES's Certification Request constituted a valid request for certification, such that the one-year waiver period commenced on that day. Choosing an earlier date for the commencement of the one-year waiver period would require us to interpret § 401(a)(1) as providing that the

one-year waiver period commenced at the filing of an invalid § 401(a)(1) certification request (in this case on the ground of incompleteness), an interpretation directly at odds with 33 C.F.R. § 325.2(b)(1)(ii).

Because the Corps is charged with determining whether to issue AES a § 404 permit for the Project, 33 U.S.C. § 1344, if the Clean Water Act is ambiguous regarding whether an invalid as opposed to only a valid request for water quality certification will trigger § 401(a)(1)'s one-year waiver period in connection with a § 404 permit application, the Corps' interpretation as set forth in 33 C.F.R. § 325.2(b)(1)(ii) is entitled to *Chevron* deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Indeed, the statute is ambiguous on the issue. Thus, under *Chevron*, we must defer to the Corps' interpretation, "so long as that interpretation is permissible in light of the statutory text and reasonable." *Ohio Valley Envtl. Coalition v. Bulen*, 429 F.3d 493, 498 (4th Cir. 2005) (internal quotation marks omitted). Here, the Corps' interpretation that only a valid request for § 401(a)(1) water quality certification, as determined by the Corps, will trigger the one-year waiver period in connection with a § 404 permit is permissible in light of the statutory text and is reasonable. Accordingly, we adhere to it. Moreover, to the extent the joint public notice in the Federal Register regarding AES's § 404 permit application is understood to be interpreting the Corps' own regulation, *i.e.*, interpreting 33 C.F.R. § 325.2(b)(1)(ii), such interpretation of its own regulation "is entitled to deference 'unless plainly erroneous or inconsistent with the regulation.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 672 (2007) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted)). Such interpretation is neither plainly erroneous nor inconsistent with the regulation.[3]

---

[3]We note that when the Corps promulgated 33 C.F.R. § 325.2(b)(1)(ii) on November 13, 1986, with an effective date of January 12, 1987, it com-

Finally, we note that AES's reliance on FERC's regulation interpreting § 401(a)(1)'s one-year waiver period is misplaced given that FERC is not charged in any manner with administering the Clean Water Act. *Alabama Rivers Alliance v. FERC*, 325 F.3d 290, 297 (D.C. Cir. 2003).

In sum, AES has failed to establish any basis for us to disturb the Corps' determination that Maryland had not waived its right to grant or deny AES's § 401(a)(1) Certification Request.

V.

Having rejected AES's waiver argument, we now turn to consider Maryland's denial of AES's § 401(a)(1) Certification Request under the arbitrary and capricious standard. Maryland relied upon four independent and alternative grounds for its denial, and AES takes issue with each one. For reasons that follow, we uphold Maryland's denial of AES's § 401(a)(1) Certification Request on the independent ground that the dredging required to accommodate the LNG tankers would create additional deep water areas where dissolved oxygen levels would fail to meet Maryland water quality standards. Accordingly, we do not reach and express no opinion on the remaining three independent and alternative grounds for Maryland's denial. *See Syracuse Peace Council v. F.C.C.*, 867 F.2d 654, 657 (D.C. Cir. 1989) ("[I]f an agency relies on two grounds for a decision, a court may sustain it if one is

mented in the Federal Register that it "believe[d] that the state has the responsibility to determine if it has received a valid request" for § 401(a)(1) water quality certification. 51 Fed. Reg. 41206-01, 41211 (Nov. 13, 1986). Because we conclude this comment is inconsistent with the plain language of 33 C.F.R. § 325.2(b)(1)(ii), we owe it no deference. *Nat'l Ass'n of Home Builders*, 551 U.S. at 672; *Md. Gen. Hosp., Inc. v. Thompson*, 308 F.3d 340, 343 (4th Cir. 2002) (agency's interpretation of its own regulation is due no deference if such interpretation is inconsistent with regulation).

valid and if the agency would clearly have acted on that ground even if the other were unavailable."); *Communication Workers of Am. v. NLRB*, 784 F.2d 847, 851 (7th Cir. 1986) ("If an agency states two grounds of decision, each sufficient, a court should sustain the decision if either reason is correct.").

With respect to Maryland's denial on the ground that the dredging required to accommodate the LNG tankers would create additional deep water areas where dissolved oxygen levels would fail to meet Maryland water quality standards, AES contends: (1) Maryland exceeded its statutory authority under § 401(a)(1) of the Clean Water Act; and (2) the conclusion is arbitrary, capricious, and unsupported by record evidence. We address each in turn.

First, AES argues that the depth of a channel is not a "discharge" under § 401(a)(1), and therefore, Maryland acted in excess of its statutory authority when it denied AES's § 401(a)(1) Certification Request based upon the channel depth required for the Project. AES's argument is without merit.

In *PUD No. 1 of Jefferson County v. Washington Dept. of Ecology*, 511 U.S. 700 (1994), the Court made clear that § 401(a)(1) authority to grant or deny water quality certification *vel non* depends on the threshold condition of a discharge. *Id.* at 711-12. Although we agree with AES that the depth of a channel itself is not a discharge under § 401(a)(1), our agreement does nothing to aid AES's cause here. AES's lack-of-statutory authority argument ignores the fact that the dredging required to increase the channel depth would undeniably cause the flowing of water into the places of navigable waters where the dredged material is removed (*i.e.*, displacing the dredged material). Although the Clean Water Act does not define the term "discharge," the Supreme Court has interpreted it to mean a "flowing or issuing out" into navigable waters. *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547

U.S. 370, 376 (2006) (internal quotation marks omitted). Moreover, in the same case, the Court squarely held that the term "discharge," as found in § 401(a)(1) of the Clean Water Act, includes within its ambit the flowing or issuing out of water. *S.D. Warren*, 547 U.S. at 376-87.

In *S.D. Warren*, the petitioner company (Warren) asked FERC to renew federal licenses for five of the hydroelectric dams it operated on a Maine river to generate power for its paper mill. *Id.* at 373-75. Each dam impounded water, which then ran through turbines and returned to the riverbed, passing around a section of the river. *Id.* at 373. Under protest, Warren applied for § 401(a)(1) water quality certifications from Maine's environmental regulatory agency. *Id.* at 375. FERC licensed the dams subject to compliance with those certifications, which required Warren to maintain a minimum stream flow and to allow passage for certain fish and eels. *Id.* After losing state administrative appeals, Warren filed suit in state court, which rejected its claim that the water discharged from its hydroelectric dams did not result in a "discharge" under § 401(a)(1) of the Clean Water Act. *Id.*

Ultimately the case came before the Supreme Court, which also rejected Warren's claim that water discharged from its hydroelectric dams did not constitute "discharge" under § 401(a)(1) of the Clean Water Act. *Id.* at 373, 375, 386-87. Of particular relevance in the case presently before us, the Supreme Court reasoned as follows in support of its holding:

> Congress passed the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a); see also *PUD No. 1*, 511 U.S., at 714, 114 S. Ct. 1900, the "national goal" being to achieve "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water," 33 U.S.C. § 1251(a)(2). To do this, the Act does not stop at

controlling the "addition of pollutants," but deals with "pollution" generally, see § 1251(b), which Congress defined to mean "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water," § 1362(19).

The alteration of water quality as thus defined is a risk inherent in limiting river flow and releasing water through turbines. Warren itself admits that its dams "can cause changes in the movement, flow, and circulation of a river . . . caus[ing] a river to absorb less oxygen and to be less passable by boaters and fish." Brief for Petitioner 23. And several *amici* alert us to the chemical modification caused by the dams, with "immediate impact on aquatic organisms, which of course rely on dissolved oxygen in water to breathe." Brief for Trout Unlimited et al. as *Amici Curiae* 13; see also, *e.g.*, Brief for National Wildlife Federation et al. as *Amici Curiae* 6 (explaining that when air and water mix in a turbine, nitrogen dissolves in the water and can be potentially lethal to fish). Then there are the findings of the Maine Department of Environmental Protection that led to this appeal:

> "The record in this case demonstrates that Warren's dams have caused long stretches of the natural river bed to be essentially dry and thus unavailable as habitat for indigenous populations of fish and other aquatic organisms; that the dams have blocked the passage of eels and sea-run fish to their natural spawning and nursery waters; that the dams have eliminated the opportunity for fishing in long stretches of river, and that the dams have prevented recreational access to and use of the river." *In re S.D.*

> *Warren Co.*, L-19713-33-E-N etc. (2003),
> in App. to Pet. for Cert. A-49.
>
> Changes in the river like these fall within a State's
> legitimate legislative business, and the Clean Water
> Act provides for a system that respects the States'
> concerns. See 33 U.S.C. § 1251(b) ("It is the policy
> of the Congress to recognize, preserve, and protect
> the primary responsibilities and rights of States to
> prevent, reduce, and eliminate pollution."); § 1256(a)
> (federal funds for state efforts to prevent pollution);
> see also § 1370 (States may impose standards on the
> discharge of pollutants that are stricter than federal
> ones).

*S.D. Warren*, 547 U.S. at 385-86 (alteration in original).

Here, similar to the dissolved oxygen problems caused by the dam operations in *S.D. Warren*, the proposed deep channel dredging by AES as part of the Project will affect the dissolved oxygen levels in the dredged areas by changing the flow of water and allowing for more water in those areas. Accordingly, we reject AES's lack-of-statutory authority argument.

Next, we consider whether Maryland's denial of AES's Request for § 401(a)(1) Water Quality Certification based upon the anticipated negative effect on water quality caused by the forty-five foot depth of the proposed deep channel dredging was arbitrary and capricious. The crux of Maryland's denial on this ground is that "the habitat that currently exists in the area to be dredged, while impaired, will simply cease to exist in its entirety if AES proceeds as proposed," because the deep channel dredging to forty-five feet will cause a twenty-nine percent increase in the total water volume of anoxic/hypoxic water in the area. (J.A. 4).

AES argues this ground fails to pass muster under the arbitrary and capricious standard because the anticipated negative effects identified by Maryland are unsupported by the record evidence. In this regard, AES primarily argues that Maryland's claim that thirty-feet is the depth at which no aquatic life can survive in Baltimore Harbor is not supported by the record evidence and is contrary to the Final EIS, which states that "pioneering benthic invertebrates would likely colonize the dredged area soon after completion of dredging. . . . [C]onversion of shallow benthic habitat to deeper, channel-like benthic habitat would not likely alter the benthic community in the vicinity of the proposed LNG terminal."[4] (J.A. 1338). Additionally, AES claims that Maryland's denial of its § 401(a)(1) Certification Request is arbitrary and capricious because Maryland had granted a similar request to Barletta-Willis, Inc. in 2005.

In reviewing Maryland's denial of AES's § 401(a)(1) Certification Request on the merits, we are mindful that the scope of our review under the arbitrary and capricious standard is narrow and highly deferential. *Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). "Especially in matters involving not just simple findings of fact but complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'" *Id.* (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983)). Thus, as we recently explained:

> In determining whether agency action was arbitrary or capricious, the court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a nar-

---

[4]Benthic means "of, relating to, or occurring at the bottom of a body of water . . . ." *Merriam-Webster's Collegiate Dictionary* 107 (10th ed. 1999).

row one. The court is not empowered to substitute its judgment for that of the agency. Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made.

The arbitrary and capricious standard is not meant to reduce judicial review to a rubber-stamp of agency action. While the standard of review is narrow, the court must nonetheless engage in a searching and careful inquiry of the record. But, this scrutiny of the record is meant primarily to educate the court so that it can understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made.

*Ohio Valley Envtl. Coalition*, 556 F.3d at 192-93 (internal quotation marks and citations omitted).

After carefully reviewing the record and considering the parties written and oral arguments, we hold that Maryland's denial of AES's Request for § 401(a)(1) Water Quality Certification based upon the anticipated negative effect on water quality caused by the forty-five foot depth of the proposed deep channel dredging was not arbitrary and capricious. Maryland examined the relevant data pertaining to the effect on water quality in the areas of the proposed deep channel dredging and articulated a satisfactory explanation for its denial on that basis, including a rational connection between the facts found and the choice made, sufficient to pass muster under the narrow arbitrary and capricious standard of review. Moreover, Maryland's denial was not based upon a clear error of judgment.

We agree with Maryland's position that AES's argument regarding the thirty-feet depth misunderstands the basis of Maryland's denial in that regard. Maryland does not use thirty-feet as a bright line test for the establishment of anoxic/hypoxic conditions. As Maryland logically explains its rationale, "[i]t is not that aquatic life is impossible at all times and at all depths below 30 feet . . . , [b]ut the data show[s] that the pycnocline tends to form within Baltimore Harbor during the summer months at approximately 30 feet and that, when it does form, the deeper waters are deprived of the [dissolved oxygen] necessary to support aquatic life." (Maryland's Br. at 37). *See also* (J.A. 901) (National Oceanic and Atmospheric Administration recounting data showing that anoxic/hypoxic conditions form in area to be dredged under the Project anywhere between 20 and 40 feet during the summer months); (J.A. 1290, Final EIS for the Project) ("The past sampling results of the area indicate that the deeper channel would probably experience periods of low dissolved oxygen or even hypoxic periods during the summer months.").

We next address AES's argument to the effect that Maryland should have granted its § 401(a)(1) Certification Request because, in 2005, Maryland had granted Barletta-Willis, Inc. a water quality certification with respect to an area to be dredged within the proposed area to be dredged by AES. The argument ignores the importance of the Baltimore Harbor Total Maximum Daily Loads Report (the Baltimore Harbor TMDL Report), issued by Maryland in December 2006. All parties agree that such report is designed to establish Total Maximum Daily Loads for nitrogen and phosphorous discharges into Baltimore Harbor. As Maryland cogently points out, the Baltimore Harbor TMDL Report, while affirmatively a pollutant-specific plan that establishes the maximum amount of particular pollutants that Baltimore Harbor, as a pollution-impaired waterway, can assimilate without further exceeding water quality standards, also recognizes the overall objective to increase areas in Baltimore Harbor that will meet dissolved oxygen standards. By increasing the areas that will

not meet dissolved oxygen standards, AES's proposal to dredge new channels to forty-five feet of depth run contrary to the objective and intent of the Baltimore Harbor TMDL Report—a consideration that was not a factor prior to Maryland's grant of Barletta-Willis, Inc.'s request for § 401(a)(1) water quality certification.

In sum, upon close examination, AES's arguments are insufficient to convince us that Maryland's denial of its § 401(a)(1) Certification Request fails under the arbitrary and capricious standard or is not in accordance with law.

## VI.

In conclusion, we: (1) hold that Maryland waived any potential claim of sovereign immunity in connection with the present petition for review by expressly consenting to defending, in federal court, its decision to deny AES's Request for § 401(a)(1) Water Quality Certification; (2) hold that AES has failed to establish any basis for us to disturb the Corps' determination that Maryland had not waived its right to grant or deny AES's § 401(a)(1) Certification Request; and (3) deny AES's petition for review of Maryland's denial of its § 401(a)(1) Certification Request on the merits.

### *PETITION FOR REVIEW DENIED*

DAVIS, District Judge, concurring:

I concur in the judgment and in Parts I-IV and VI of Judge Hamilton's thorough opinion. I respectfully write separately because, as to Part V, I would deny the petition for review on a different ground.

Section 401 of the Clean Water Act requires a certification from the state for activities that may result in any "discharge into navigable waters." 33 U.S.C. § 1341(A)(1). To have a "discharge" within the meaning of the Act there must be a dis-

charge from a "point source." *ONDA v. USFS*, 550 F.3d 778, 783-84 (9th Cir. 2008).

In *S.D. Warren*, the Supreme Court "held that the term 'discharge' is not limited to the 'discharge of a pollutant,' but may also include the 'flowing or issuing out' of non-pollutants, or even water." *Id.* at 783. The dams and turbines at issue in *S.D. Warren* were undeniably "point source[s]" within the meaning of 33 U.S.C. § 1362(14), and the parties therefore did not question such classification. The Court's detailed discussion of the Clean Water Act's remedial purpose was thus made in the context of an unquestioned "point source" out of which water was indisputably being emitted.

Here, I would not reach the question of whether AES's proposed deep channel dredging would result in a "discharge" from a "point source," but would instead deny the petition for review on the basis that Maryland's decision was not arbitrary and capricious with respect to Maryland's third justification for denial: "Final Pipeline Route and Avoidance/Minimization of Pipeline Impacts."* (J.A. 5). Maryland's denial on such point appears rationally tied to the facts of the case and AES fails to overcome the presumption in favor of deeming the agency action valid. *Ohio Valley Envtl. Coalition*, 556 F.3d at 192.

Maryland's stated justification for denial includes AES's failure to provide sufficient information such that Maryland could "determine if the proposed pipeline minimizes impacts to wetlands and waterways or otherwise violates applicable water quality standards." (J.A. 5). The information purportedly lacking includes the method of crossing and impacts from crossing a sensitive waterway called "Deer Creek." Maryland's concerns regarding the impacts on Deer Creek's

---

*AES does not challenge the fact that stream crossings along the proposed pipeline route may result in a "discharge into navigable waters." 33 U.S.C. § 1341(A)(1).

water quality were consistently supported by findings of the National Oceanic and Atmospheric Administration (NOAA), which in June of 2008 asserted that an "open-cut" crossing at Deer Creek was "not-acceptable" due to impacts on spawning habitat. (J.A. 904). As recently as January of 2009, approximately three months prior to the issuance of Maryland's denial letter, NOAA reiterated its position, this time in bold-face text, that a horizontal directional drilling (HDD) crossing and not an "open cut" crossing must be utilized to protect the sensitive Deer Creek watershed. (J.A. 2155). Maryland's contention that it lacked sufficient information to determine the water quality impacts stemming from the Deer Creek crossing is further supported by the fact that less than a month prior to the issuance of Maryland's denial letter the Corps, at AES's request, suspended its review of AES's federal permit application due to lack of information, including the lack of "final drawings" of proposed stream crossings. (J.A. 2481-82). Finally, a letter from Maryland to AES, discussing a separate permit application, indicates that both the method and impacts of several stream crossings, including Deer Creek, remained unresolved several weeks *after* Maryland denied the water quality certification. (J.A. 2483).

Based on the foregoing, I would conclude that AES fails to establish that Maryland acted in an arbitrary and capricious manner in denying the permit on this ground.