**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1640**

UPSTATE FOREVER; SAVANNAH RIVERKEEPER,

Plaintiffs - Appellants,

v.

KINDER MORGAN ENERGY PARTNERS, L.P.; PLANTATION PIPE LINE COMPANY, INC.,

Defendants - Appellees.

------------------------------

ANDERSON COUNTY, SOUTH CAROLINA; PIPELINE SAFETY TRUST,

Amici Supporting Appellant,

AMERICAN PETROLEUM INSTITUTE; ASSOCIATION OF OIL PIPE LINES; GPA MIDSTREAM ASSOCIATION; TEXAS PIPELINE ASSOCIATION; NATIONAL ASSOCIATION OF COUNTIES; NATIONAL LEAGUE OF CITIES; NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES; AMERICAN FOREST AND PAPER ASSOCIATION; AMERICAN IRON AND STEEL INSTITUTE; EDISON ELECTRIC INSTITUTE; NATIONAL MINING ASSOCIATION; UTILITY WATER ACT GROUP; STATE OF WEST VIRGINIA; STATE OF SOUTH CAROLINA; STATE OF ALABAMA; STATE OF ARKANSAS; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MISSOURI; STATE OF OKLAHOMA; STATE OF UTAH; STATE OF WISCONSIN; GOVERNOR PHIL BRYANT

Amici Supporting Appellee.

Appeal from the United States District Court for the District of South Carolina, at Anderson. Henry M. Herlong, Jr., Senior District Judge. (8:16-cv-04003-HMH)

Argued: December 7, 2017            Decided: April 12, 2018

Before GREGORY, Chief Judge, and KEENAN and FLOYD, Circuit Judges.

Vacated and remanded by published opinion. Judge Keenan wrote the majority opinion, in which Chief Judge Gregory joined. Judge Floyd wrote a dissenting opinion.

**ARGUED:** Frank S. Holleman, III, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Appellants. James P. Cooney, III, WOMBLE BOND DICKINSON (US) LLP, Charlotte, North Carolina, for Appellees. **ON BRIEF:** Christopher K. DeScherer, SOUTHERN ENVIRONMENTAL LAW CENTER, Charleston, South Carolina, for Appellants. Richard E. Morton, Todd W. Billmire, Jackson R. Price, Charlotte, North Carolina; Clayton M. Custer, WOMBLE CARLYLE SANDRIDGE & RICE, LLP, Greenville, South Carolina, for Appellees. Catherine H. McElveen, RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC, Mount Pleasant, South Carolina, for Amicus Pipeline Safety Trust. Leon C. Harmon, Anderson, South Carolina, for Amicus Anderson County, South Carolina. Alan Wilson, Attorney General, Robert Cook, Solicitor General, J. Emory Smith, Jr., Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina, for Amicus State of South Carolina. Patrick Morrisey, Attorney General, Thomas M. Johnson, Jr., Deputy Solicitor General, John S. Gray, Deputy Attorney General, Charleston, West Virginia, for Amicus State of West Virginia. Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama. Leslie Rutledge, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas. Curtis T. Hill, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF INDIANA, Indianapolis, Indiana, for Amicus State of Indiana. Derek Schmidt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas, for Amicus State of Kansas. Jeff Landry, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana, for Amicus State of Louisiana. Joshua D. Hawley, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSOURI, Jefferson City, Missouri, for Amicus State of Missouri. Mike Hunter, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma, for Amicus State of Oklahoma. Sean D. Reyes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF UTAH, Salt Lake City, Utah, for Amicus State of Utah. Brad Schimel, Attorney General, WISCONSIN

DEPARTMENT OF JUSTICE, Madison, Wisconsin, for Amicus State of Wisconsin. Samuel L. Brown, HUNTON & WILLIAMS LLP, San Francisco, California; Nash E. Long, III, Brent A. Rosser, HUNTON & WILLIAMS LLP, Charlotte, North Carolina; Michael R. Shebelskie, HUNTON & WILLIAMS LLP, Richmond, Virginia, for Amici National Association of Counties, National League of Cities, National Association of Clean Water Agencies, American Forest and Paper Association, American Iron and Steel Institute, Edison Electric Institute, National Mining Association, and Utility Water Act Group. David H. Coburn, Cynthia L. Taub, STEPTOE & JOHNSON LLP, Washington, D.C., for Amici American Petroleum Institute, Association of Oil Pipe Lines, GPA Midstream Association, and Texas Pipeline Association.

———————————

BARBARA MILANO KEENAN, Circuit Judge:

In late 2014, several hundred thousand gallons of gasoline spilled from a rupture in a pipeline owned by Plantation Pipe Line Company, Inc., a subsidiary of Kinder Morgan Energy Partners, LP (collectively, Kinder Morgan), near Belton, South Carolina. It is undisputed that the gasoline has seeped into nearby waterways, and the plaintiffs allege that the gasoline has continued to travel a distance of 1000 feet or less from the pipeline to those "navigable waters."

Two plaintiff conservation groups brought a "citizen suit" under the Clean Water Act (the CWA, or the Act), 33 U.S.C. §§ 1251–1387, alleging that Kinder Morgan was in violation of the Act for polluting navigable waters without a permit and seeking relief to remediate the ongoing pollution. This case requires us to determine whether citizens may bring suit alleging a violation of the CWA when the source of the pollution, the pipeline, is no longer releasing the pollutant, but the pollutant allegedly is passing a short distance through the earth via ground water and is being discharged into surface waterways.

The district court held that it lacked subject matter jurisdiction under the CWA, because the pipeline has been repaired and the pollutants currently pass through ground water to reach navigable waters. We conclude that the district court erred in holding that it lacked jurisdiction, because citizens may bring suit under 33 U.S.C. § 1365(a) for discharges of pollutants that derive from a "point source" and continue to be "added" to navigable waters. We further hold that the plaintiffs have stated a valid claim for a discharge under the CWA. Accordingly, we vacate the district court's judgment, and remand for further proceedings consistent with this opinion.

4

I.

A.

In 1972, Congress enacted the CWA to eliminate the discharge of certain pollutants or "effluents" into the "navigable waters" of the United States. *See S. Appalachian Mountain Stewards v. A & G Coal Corp.*, 758 F.3d 560, 563 (4th Cir. 2014); *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 264–65 (4th Cir. 2001). The CWA's stated purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The federal government's prior regime of water pollution control focused primarily on measuring direct injuries to the Nation's waters using water quality standards. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 151 (4th Cir. 2000) (en banc) [*Friends of the Earth II*]. In the CWA, however, Congress shifted its regulatory focus for water pollution from water quality standards to limiting discharges of pollutants. *See id.* One of the CWA's central provisions establishes that "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a).

The Act authorizes exceptions to this general prohibition in the form of permits issued in accordance with the National Pollutant Discharge Elimination System (NPDES), which allows limited discharges. *See* 33 U.S.C. §§ 1311(a), 1342; *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004) ("[T]he NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants."); *Friends of the Earth II*, 204 F.3d at 151. Both the Environmental Protection Agency (EPA) and state environmental control agencies may issue NPDES

5

permits. *See Friends of the Earth II*, 204 F.3d at 152. However, consistent with the CWA's general prohibition, a polluter does not violate the statute only when it exceeds limitations in its permit. Instead, a polluter also may be in violation of the statute due to a discharge for which the polluter could not have obtained *any* permit. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 561 (5th Cir. 1996) ("Nothing in the CWA limits a citizen's right to bring an action against a person who is allegedly discharging a pollutant without a permit solely to those cases where EPA has promulgated an effluent limitation or issued a permit that covers the discharge.").

The CWA authorizes both citizens and government agencies to enforce the Act's provisions. Citizen suits under the CWA have the "central purpose of permitting citizens to abate pollution when the government cannot or will not command compliance." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987). The Act contains the following citizen suit provision:

> [A]ny citizen may commence a civil action on his own behalf—
>
> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is *alleged to be in violation of* . . . an effluent standard or limitation under this chapter . . . .

33 U.S.C. § 1365(a) (emphasis added). An "effluent standard or limitation" is defined to include the Act's central prohibition on the "discharge of any pollutant" without a permit. *See* 33 U.S.C. §§ 1365(f), 1311(a).

The Act sets forth a technical definition of the term "discharge of a pollutant," which is defined expansively to include "any addition of any pollutant to navigable

6

waters from any point source."[1]  33 U.S.C. § 1362(12)(A).  A "point source" in turn is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . ."  33 U.S.C. § 1362(14).  The term "navigable waters" is defined in the CWA as "the waters of the United States."  33 U.S.C. § 1362(7).  The Supreme Court has interpreted the term "navigable waters" to mean more than waters that are navigable-in-fact, and to include, for example, wetlands and related hydrological environs.  *See, e.g.*, *Rapanos v. United States*, 547 U.S. 715, 730–31, 735 (2006) (plurality opinion) (observing that navigable waters include more than traditionally navigable waters and may include certain wetlands); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985) ("Congress chose to define the waters covered by the Act broadly.").

B.

The plaintiffs Upstate Forever and the Savannah Riverkeeper[2] (collectively, the plaintiffs) allege that in late 2014, over 369,000 gallons of gasoline spilled from Kinder Morgan's underground pipeline, which extends over 1100 miles through parts of the eastern United States.  In December 2014, citizens in Anderson County, South Carolina,

---

[1] Although Section 1311(a) refers to the "discharge of any pollutant" and Section 1362(12)(A) defines "discharge of a pollutant," we construe these two terms to be substantively identical and refer to the "discharge of a pollutant."

[2] Upstate Forever and the Savannah Riverkeeper are non-profit public interest organizations that operate in Anderson County, South Carolina, where the spill occurred. Upstate Forever has stated goals of developing clean water in the Upstate region of South Carolina, and the Savannah Riverkeeper works to restore the lakes and tributaries in the Savannah River watershed.

discovered dead plants, a petroleum odor, and pools of gasoline in the vicinity of the pipeline. The plaintiffs allege that gasoline and gasoline toxins have seeped and continue to seep into ground water, wetlands, and waterways in Anderson County and the Savannah River watershed. They allege that although a reported 209,000 gallons were recovered by the end of 2015, no significant amount of contaminants has been removed since that time. Consequently, at the time that the plaintiffs filed their complaint, at least 160,000 gallons allegedly remained unrecovered. Kinder Morgan repaired the pipeline shortly after the initial spill.

When Kinder Morgan's pipeline broke six to eight feet underground, gasoline and related contaminants spilled out into soil and ground water. The plaintiffs allege that these contaminants are seeping into two nearby tributaries of the Savannah River, Browns Creek and Cupboard Creek, and their adjacent wetlands. The pipeline broke less than 1000 feet from Browns Creek and its adjacent wetland, and 400 feet from Cupboard Creek and a second wetland. Both waterways and the wetlands are downgradient from the spill site. The plaintiffs allege that gasoline pollutants from the pipeline are seeping into navigable waters as defined by the CWA, including the above two creeks in Anderson County, Broadway Lake, Lake Secession, Lake Russell, and the Savannah River.[3]

---

[3] Kinder Morgan does not challenge the plaintiffs' allegation that these waters, including Browns Creek, Cupboard Creek, and their adjacent wetlands, constitute navigable waters as defined by the CWA. 33 U.S.C. § 1362(7).

The plaintiffs allege that a "plume" of petroleum contaminants continues to migrate into these waterways years later through ground water and various natural formations at the spill site, including "seeps, flows, fissures, and channels." Hazardous gasoline contaminants have been detected on several occasions at the spill site in ground water wells. Contaminants were also detected in Browns Creek as early as January 2015, and additional tests in Browns Creek have reported high levels of contaminants on several later dates in 2015 and in 2016.

Kinder Morgan has implemented certain remediation and recovery measures under the guidance of the South Carolina Department of Health and Environmental Control (DHEC). DHEC is the agency authorized to issue NPDES permits and oversee water quality in South Carolina. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 390 (4th Cir. 2011) [*Friends of the Earth III*]; S.C. Code § 48-1-100(B).

The plaintiffs allege that Kinder Morgan has failed to comply fully with DHEC's abatement instructions. They claim that although DHEC instructed Kinder Morgan to test for pollution in March 2016, Kinder Morgan only began that additional testing after the plaintiffs made their own visit to the spill site in August 2016. The plaintiffs further allege that their testing conducted in August 2016 revealed that the levels of gasoline contaminants in Browns Creek actually were increasing almost two years after the spill. During their August 2016 visit to the area, oil sheens were visible on the surface of Browns Creek, and devices used to absorb the oil had not been maintained and were saturated with oil.

9

Kinder Morgan allegedly delayed by six months its submission to DHEC of the required site remediation plan and site assessment, and also refused to comply with another of DHEC's water sampling requests. Publicly available data on DHEC's website indicate that DHEC sampled surface waters at Browns Creek in February 2017 and found pollutants at three locations, each of which is being remediated. South Carolina Department of Health and Environmental Control, *Surface Water Sampling Event*, http://www.scdhec.gov/HomeAndEnvironment/Pollution/CleanUpPrograms/OngoingProj ectsUpdates/PlantationPipeline/SurfaceWaterSamplingEvent/ (last visited Apr. 11, 2018).

The plaintiffs filed this suit in December 2016, alleging discharges of gasoline and gasoline pollutants without a permit, in violation of the CWA under 33 U.S.C. § 1311(a).[4] The complaint includes allegations that the pipeline ruptured and caused a discharge that has polluted, and continues to pollute, navigable waters by seeping from a point source over a distance of 1000 feet or less through soil and ground water to nearby tributaries and wetlands. The plaintiffs thus allege in their complaint two interrelated violations of the CWA: (1) that Kinder Morgan has caused discharges of pollutants from point sources to navigable waters without a permit; and (2) that Kinder Morgan has caused discharges of pollutants that continue to pass through ground water with a "direct hydrological connection" to navigable waters. The plaintiffs also allege that the remediation actions taken to date by Kinder Morgan have been insufficient to abate the

---

[4] Kinder Morgan does not contend that gasoline and related contaminants are not pollutants under the CWA. *See United States v. Hamel*, 551 F.2d 107, 110–11 (6th Cir. 1977) (holding that the CWA definition of "pollutant" covers gasoline discharges).

pollution, and seek damages, declaratory relief, and injunctive relief requiring that Kinder Morgan take further measures to control and abate the spill.

Kinder Morgan moved to dismiss the plaintiffs' complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, contending both that the district court lacked subject matter jurisdiction and that the plaintiffs had failed to state a claim for relief. Addressing first the sufficiency of the plaintiffs' pleadings, the district court held that the plaintiffs had failed to state a claim because the pipeline had been repaired and no longer was discharging pollutants "directly" into navigable waters. The court also held that it lacked subject matter jurisdiction over the complaint, stating that the CWA did not encompass the movement of pollutants through ground water that is hydrologically connected to navigable waters. Accordingly, the court dismissed the plaintiffs' complaint on both grounds. The plaintiffs timely noted this appeal.

## II.

On appeal, the plaintiffs contend that the district court erred in determining that the continuing addition of pollutants to navigable waters is not an ongoing violation of the CWA because the pipeline has been repaired. According to the plaintiffs, a claim for a discharge of a pollutant, in violation of 33 U.S.C. § 1311(a), need not allege that the pollutant is being discharged *directly* from the point source into navigable waters. They assert that the CWA also prohibits the discharge of pollutants from a point source through ground water that has a direct hydrological connection to navigable waters.

11

In response, Kinder Morgan contends that the district court did not err because the violation ceased once the pipeline was repaired. Alternatively, Kinder Morgan asserts that if seepage is ongoing, the pollution is seeping from nonpoint sources, namely, from natural formations at the spill site. Kinder Morgan also argues that discharges into navigable waters from hydrologically connected ground water do not fall within the CWA's definition of a "discharge of a pollutant" in 33 U.S.C. § 1362(12)(A). We disagree with Kinder Morgan's position.

## A.

We review de novo the district court's dismissal of the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 (4th Cir. 2004); *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768–69 (4th Cir. 1991). A district court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must "provide[] sufficient detail [ ] to show that he has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 396 (4th Cir. 2014) (citation omitted).

As a threshold matter, a court first must determine whether it has jurisdiction to entertain a claim. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998). A court's determination of subject matter jurisdiction addresses whether the court has the

12

authority to entertain a particular kind of case, not whether a claim for relief is viable under a particular construction of a statute. *See id.* at 89. Unless Congress has "clearly state[d] that [a statutory limitation] is jurisdictional . . . courts should treat the restriction as nonjurisdictional in character." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (citations and internal quotation marks omitted).

In the present case, the primary issue we consider is whether an indirect discharge of a pollutant through ground water, which has a direct hydrological connection to navigable waters, can support a theory of liability under the CWA. Because our answer to this question largely depends on our construction of the statutory term "discharge of a pollutant," the question ordinarily would not be jurisdictional in nature.[5] However, because courts have "jurisdiction" over CWA citizen suits only if the complaint alleges an ongoing violation, *Gwaltney*, 484 U.S. at 64, we must address the question of an ongoing violation before proceeding further in this case. Accordingly, we first address whether the plaintiffs have alleged an ongoing violation and, if so, whether they sufficiently have alleged a nexus between the source of the pollution and navigable waters to state a claim for discharge of a pollutant under the CWA. *See Steel Co.*, 523 U.S. at 88–90.

---

[5] Had the plaintiffs alleged that ground water, of itself, falls within the meaning of navigable waters under the CWA, we would be confronting a distinctly different question here. *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 180 (2001) (referring to "navigable waters" as a "traditional jurisdictional term"). However, in this case, the plaintiffs have alleged only that Kinder Morgan discharged pollutants "*via* hydrologically connected groundwater to surface waters" (emphasis added).

B.

The CWA authorizes citizens to seek injunctive relief only to abate a "continuous or intermittent" violation. *Gwaltney*, 484 U.S. at 64; *Friends of the Earth III*, 629 F.3d at 402 ("We have instructed that a citizen plaintiff can prove an ongoing violation . . . by proving violations that continue on or after the date the complaint is filed." (citation omitted)). Conversely, when a violation of the CWA is "wholly past," the federal courts do not have jurisdiction to entertain a citizen suit, even if the past discharge violated the CWA. *Gwaltney*, 484 U.S. at 64. As we already have noted, the CWA's citizen suit provision is intended primarily to allow citizens "to abate pollution when the government cannot or will not command compliance." *Id.* at 62; *cf. Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 17 n.27 (1981) ("[P]rivate enforcement suits were intended [often] to be limited to [ ] injunctive relief."). The citizen suit provision thus enables citizens to seek abatement of polluting discharges to further the CWA's central purpose, namely, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

In *Gwaltney*, the Supreme Court emphasized that the CWA, like other environmental statutes, authorizes "prospective relief" that only can be attained while a violation is ongoing and susceptible to remediation. 484 U.S. at 57; *see also, e.g.*, 15 U.S.C. § 2619(a)(1) (authorizing citizen suits against persons "alleged to be in violation of" the statute); 42 U.S.C. § 6972 (same). We applied the principles of *Gwaltney* in our decision in *Goldfarb v. Mayor of Baltimore*, holding that a claim of an ongoing violation supported a citizen suit under the Resource Conservation and Recovery Act of 1976

14

(RCRA), Pub. L. No. 94-580, 90 Stat. 2796 (1976) (codified as amended at 42 U.S.C. §§ 6901–6992k), under a provision that is "identical" to the citizen suit authorization in the CWA.  791 F.3d 500, 513 (4th Cir. 2015).

The plaintiffs in *Goldfarb* alleged that the City of Baltimore had stored hazardous chemicals, which had leaked from the point of storage and had continued to migrate through the soil in violation of the RCRA's permitting standards.  *Id.* at 512.  In response to the City's contention that any RCRA violations were wholly past under the rationale of *Gwaltney*, we observed that "although a defendant's *conduct* that is causing a *violation* may have ceased in the past . . . what is relevant is that the *violation* is continuous or ongoing."  *See id.* at 511–13 (citing *S. Rd. Assocs. v. IBM Corp.*, 216 F.3d 251, 255 (2d Cir. 2000)).  Accordingly, we held that the plaintiffs had alleged an ongoing violation of the RCRA.  *Id.*

Our analysis in *Goldfarb* regarding an ongoing violation is equally applicable here.[6]  Nothing in the language of the CWA suggests that citizens are barred from seeking injunctive relief after a polluter has repaired the initial cause of the pollution.  When interpreting a statute, we attend first to the statute's plain language.  *United States v. Ide*, 624 F.3d 666, 668 (4th Cir. 2010).  Like the RCRA, the CWA's plain language requires only that the citizen allege that the polluter "be in violation of" an "effluent standard or limitation" under the Act.  33 U.S.C. § 1365(a); *see Goldfarb,* 791 F.3d at

---

[6] We disagree with the dissent's view that our decision in *Goldfarb* is not helpful. We held in *Goldfarb* under an identical citizen suit provision that conduct causing a violation need not be ongoing to state a claim, so long as the violation itself is ongoing. 791 F.3d at 513.

512–13. As noted above, an "effluent limitation" of the CWA includes any unpermitted "discharge of a pollutant." 33 U.S.C. §§ 1365(f), 1311(a). Accordingly, the relevant violation here is the discharge of a pollutant, defined in the Act as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A).

Kinder Morgan's gasoline pipeline unambiguously qualifies as a point source.[7] 33 U.S.C. § 1362(14) (defining a point source to include a "pipe" or "conduit"). The plaintiffs claim that pollutants originating from this point source continue to be "added" to bodies of water that allegedly are navigable waters under the Act, including the two creeks in Anderson County, adjacent wetlands, Broadway Lake, Lake Secession, Lake Russell, and the Savannah River watershed. The CWA's language does not require that the point source continue to release a pollutant for a violation to be ongoing. The CWA requires only that there be an ongoing "addition . . . to navigable waters," regardless whether a defendant's conduct causing the violation is ongoing. 33 U.S.C. §

---

[7] Under the dissent's view, pollution becomes "nonpoint source pollution" not covered by the CWA at the moment when the point source no longer actively releases the pollutant. *See, e.g.*, *ONRC Action v. U.S. Bureau of Reclamation*, 798 F.3d 933, 936 (9th Cir. 2015) (noting that the CWA provides no direct mechanism for regulating "nonpoint source pollution"). We are not persuaded by this argument, because the plaintiffs adequately have alleged that the pipeline is *a* point source of the discharge, which satisfies the CWA's requirement that the alleged pollution be "from *any* point source." *See* 33 U.S.C. § 1362(12)(A) (emphasis added). Moreover, the cases relied on by the dissent show that nonpoint source pollution arises from "dispersed activities over large areas, and is not traceable to any single discrete source." *See, e.g.*, *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1184 (9th Cir. 2002); *see also* 33 U.S.C. 1314(f) (providing examples of nonpoint source pollution, including "agricultural and silvicultural activities"). The plaintiffs here allege that the pollution is traceable not to dispersed activities and nonpoint sources but to Kinder Morgan's pipeline, a discrete source.

16

1362(12)(A). *See Goldfarb*, 791 F.3d at 513; *IBM Corp.*, 216 F.3d at 254 (noting under identical RCRA citizen suit provision that "defendant's current activity at the site is not a prerequisite for finding a current violation").

The CWA's term "discharge of a pollutant" is a statutory term of art precisely defined in the CWA. *Cf. Riverside Bayview Homes, Inc.*, 474 U.S. at 133 (noting that statutory definition of "navigable waters" in CWA makes ordinary meaning of those words less important). The definition does not place temporal conditions on the discharge of a pollutant from a point source. Nor does the definition limit discharges under the Act to additions of pollutants to navigable waters from a point source that continues actively to release such pollutants. Instead, the precondition for alleging a cognizable discharge of a pollutant is only that the plaintiff allege an ongoing addition to navigable waters originating from a point source. 33 U.S.C. § 1362(12)(A). Moreover, as we explain below, the CWA is not limited to discharges of pollutants "directly" from the point source to navigable waters. *See, e.g.*, *Hawai'i Wildlife Fund v. Cty. of Maui*, No. 15-17447, 2018 WL 1569313, at \*7–\*8 (9th Cir. Feb. 1, 2018). Necessarily, when a discharge is indirect, there will be a delay between the time at which pollution leaves the point source and the time at which it is added to navigable waters. However, nothing in the CWA's language indicates that such a delay prevents the pollution from constituting an ongoing violation for purposes of a citizen suit, as long as pollutants continue to be "added" to navigable waters. *See* 33 U.S.C. § 1362(12)(A). The plaintiffs have alleged such an ongoing addition here.

The CWA is a strict liability statute. *Friends of the Earth II,* 204 F.3d at 151. As noted above, Congress set forth in the Act its intention that "the discharge of pollutants into the navigable waters be eliminated," 33 U.S.C. § 1251(a)(1), not that the originating source of pollutants be corrected. Thus, remedial efforts taken in good faith "do[] not *ipso facto* establish the absence of federal jurisdiction over a citizen suit." *Am. Canoe Ass'n v. Murphy Farms*, 412 F.3d 536, 540 (4th Cir. 2005). To protect the nation's waters under the CWA, abatement of a pollutant requires more than the repair of a pipeline, and the need for such abatement continues so long as the contaminant continues to flow into navigable waters. *See Gwaltney*, 484 U.S. at 62 (explaining that CWA's citizen suit provision has "the central purpose of permitting citizens to abate pollution"). Thus, the fact that a ruptured pipeline has been repaired, of itself, does not render the CWA violation wholly past.[8]

Our conclusion is not altered by Kinder Morgan's citation to cases from other circuits. Those decisions were based on materially different facts. For example, in *Hamker v. Diamond Shamrock Chemical Co.,* the Fifth Circuit examined a complaint containing allegations of a discharge of oil into ground water from the defendant's pipe, rather than a discharge reaching navigable waters. *See* 756 F.2d 392, 397 (5th Cir. 1985).

---

[8] The dissent relies on *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133 (10th Cir. 2005), for its conclusion that this is an "ongoing migration" case that does not fall under the CWA's citizen suit provision. However, that court did not hold that an ongoing migration of pollutants cannot constitute a continuing violation of the CWA, but rather noted that the case before the court did not involve a simple ongoing migration of pollutants. *Id.* at 1140.

18

As the court observed, the complaint alleged only that the discharged oil was "leaking into ground water" and "grasslands," not into navigable waters.[9] *Id.* Likewise, the Second Circuit held that continuing decomposition of "lead shot" in the Long Island Sound is not a "present violation" of the CWA. *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1312–13 (2d Cir. 1993). That holding pertained to whether the continuing effects of pollutants *already* "deposited" into a navigable water constituted a continuing violation. *Id.* at 1313. In contrast, the plaintiffs allege here that pollutants *continue to be added to* navigable waters, a violation encompassed within the Act's statutory definition. Accordingly, we conclude that the plaintiffs have alleged an ongoing violation of 33 U.S.C. § 1311(a), and that the district court erred in dismissing their complaint for lack of subject matter jurisdiction.

## C.

### i.

We turn to consider the question of first impression in this Circuit whether a discharge of a pollutant that moves through ground water before reaching navigable waters may constitute a discharge of a pollutant, within the meaning of the CWA. Initially, we observe that a discharge of a pollutant under the Act need not be a discharge "directly" to a navigable water from a point source. In *Rapanos v. United States*, the

---

[9] Moreover, to the extent that *Hamker*'s reasoning suggests that an ongoing violation requires that the point source continually discharge a pollutant, *Hamker* contravenes our decision in *Goldfarb*, and we decline to adopt the Fifth Circuit's approach. *See Goldfarb*, 791 F.3d at 513.

Supreme Court considered the kinds of connected waters covered by the CWA. *See* 547 U.S. at 732–38. Justice Scalia, writing for a plurality of four Justices, concluded that certain wetlands and intermittent streams did not themselves fall within the meaning of navigable waters under the CWA.[10] *See id.* at 739. However, when analyzing the kinds of connected waters that might fall under the CWA, Justice Scalia observed that "[t]he Act does not forbid the 'addition of any pollutant *directly* to navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters.'" *Id.* at 743 (quoting 33 U.S.C. § 1362(12)(A)). Accordingly, he observed that federal courts consistently have held that a discharge of a pollutant "that naturally washes downstream likely violates § 1311(a)." *Id.* (emphasis removed) (citing *United States v. Velsicol Chem. Corp.*, 438 F. Supp. 945, 946–47 (W.D. Tenn. 1976)).

The plain language of the CWA requires only that a discharge come "from" a "point source." *See* 33 U.S.C. § 1362(12)(A). Just as the CWA's definition of a

---

[10] The district court here rejected the plaintiffs' argument that the CWA covers a discharge through soil and ground water, because the court concluded that such an argument relies on an impermissible "Land is Waters" approach to CWA jurisdiction. In reaching this conclusion, the district court relied on the plurality opinion in *Rapanos*, which characterized the plaintiffs' theory there that "intermittent streams" were navigable waters as a so-called "Land is Waters" approach, and rejected that approach. 547 U.S. at 732–34. However, Justice Kennedy's controlling concurrence in *Rapanos* did not join the plurality in rejecting the plaintiffs' theory as a "Land is Waters" approach to CWA jurisdiction. 547 U.S. at 768–70; *United States v. Robertson*, 875 F.3d 1281, 1292 (9th Cir. 2017) (holding that Justice Kennedy's "significant nexus" test controls after *Rapanos*). Moreover, the "Land is Waters" theory in *Rapanos* involved whether certain bodies of water themselves qualified as navigable waters, which is not at issue here. 547 U.S. at 739 (plurality opinion). Thus, irrespective whether a "Land is Waters" approach remains viable under the CWA following *Rapanos*, the plaintiffs' theory in the present case does not rely on such an approach.

20

discharge of a pollutant does not require a discharge directly to navigable waters, *Rapanos*, 547 U.S. at 743, neither does the Act require a discharge directly from a point source,[11] *see* 33 U.S.C. § 1362(12)(A). The word "from" indicates "a starting point: as (1) a point or place where an actual physical movement . . . *has its beginning.*" Webster's Third New International Dictionary 913 (Philip Babcock Gove et al. eds., 2002) (emphasis added); *see also* The American Heritage Dictionary of the English Language 729 (3d ed. 1992) (noting "from" indicates a "starting point" or "cause"). Under this plain meaning, a point source is the starting point or cause of a discharge under the CWA, but that starting point need not also convey the discharge directly to navigable waters.

To hold otherwise effectively would require that any discharge of a pollutant cognizable under the CWA be seamlessly channeled by point sources until the moment the pollutant enters navigable waters. The Second Circuit rejected such an interpretation of the CWA, and we agree with that court's reasoning. In *Waterkeeper Alliance, Inc. v.*

---

[11] The dissent relies on cases that include language stating that a point source must "convey" or "introduce" pollutants to navigable waters. *See, e.g.*, *Miccosukee*, 541 U.S. at 105 (observing that "a point source . . . need only convey the pollutant to 'navigable waters'"); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y.*, 273 F.3d 481, 491 (2d Cir. 2001) (stating that a "point source must introduce the pollutant into navigable water" (emphasis omitted) (citation omitted)). We disagree with any suggestion that these cases support the conclusion that the CWA requires a discharge from the point source directly to navigable waters. First, these cases simply did not confront the question of an indirect discharge of pollutants through land or ground water over time. Second, many of these cases were decided before *Rapanos* clarified that the CWA's language does not require a direct discharge. *See* 547 U.S. at 743; *Hawai'i Wildlife Fund*, 2018 WL 1569313, at *7–*8. Finally, as we explain below, the point source here allegedly *is* "conveying" and "introducing" pollutants to the navigable waters, albeit indirectly, because it is the undisputed cause of the addition.

21

*EPA*, the Second Circuit held that if courts required both the cause of the pollution *and* any intervening land to qualify as point sources, such an interpretation would, in practice, "impose a requirement not contemplated by the Act: that pollutants be channelized not once but twice before the EPA can regulate them." 399 F.3d 486, 510–11 (2d Cir. 2005); *see also Concerned Area Residents for Env't v. Southview Farm*, 34 F.3d 114, 119 (2d Cir. 1994) (holding that liquid manure that passed from tankers through intervening fields to nearby waters constituted a discharge from a point source). The Ninth Circuit likewise rejected the theory that the CWA creates liability for discharges "only . . . where the point source itself directly feeds into the navigable water—e.g., via a pipe or a ditch." *Hawai'i Wildlife Fund*, 2018 WL 1569313, at *7.

The logic of *Waterkeeper Alliance* and *Hawai'i Wildlife Fund* is equally applicable here. The plaintiffs have alleged that the pipeline is the starting point and cause of pollution that has migrated and is migrating through ground water to navigable waters. Accordingly, we hold in agreement with the Second and Ninth Circuits that to qualify as a discharge of a pollutant under the CWA, that discharge need not be channeled by a point source until it reaches navigable waters.

ii.

Although we conclude that an indirect discharge may fall within the scope of the CWA, such discharges must be sufficiently connected to navigable waters to be covered under the Act. As the Ninth Circuit recently held, a discharge that passes from a point source through ground water to navigable waters may support a claim under the CWA. *Hawai'i Wildlife Fund*, 2018 WL 1569313, at *8. However, a discharge through ground

22

water does not always support liability under the Act. *Id.* Instead, the connection between a point source and navigable waters must be clear.

The EPA has developed the term "direct hydrological connection" to identify for purposes of the CWA whether there is a clear connection between the discharge of a pollutant and navigable waters when the pollutant travels through ground water. The EPA consistently has taken the position that the Act applies to discharges "from a point source via ground water that has a direct hydrologic connection to surface water." National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitations Guidelines and Standards for Concentrated Animal Feeding Operations, 66 Fed. Reg. 2960, 3015 (proposed Jan. 12, 2001) [CAFOs Standards]; *see also* Amendments to the Water Quality Standards Regulation That Pertain to Standards on Indian Reservations, 56 Fed. Reg. 64,876, 64,892 (Dec. 12, 1991) ("[T]he Act requires NPDES permits for discharges to groundwater where there is a direct hydrological connection between groundwaters and surface waters."). The assessment of the directness of a hydrological connection is a "factual inquiry," in which "time and distance" are relevant, as well as factors such as "geology, flow, and slope." CAFOs Standards, 66 Fed. Reg. at 3017. This interpretation by the EPA of its statutory authority "warrants respectful consideration," especially in the context of a "complex and highly technical regulatory program." *Wis. Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 497 (2002) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *see also Riverside Bayview Homes, Inc.*, 474 U.S. at 131.

In light of the above considerations, we hold that a plaintiff must allege a direct hydrological connection between ground water and navigable waters in order to state a claim under the CWA for a discharge of a pollutant that passes through ground water.[12] This determination necessarily is fact-specific. In the present case, the plaintiffs have alleged that pollutants are seeping into navigable waters in Anderson County about 1000 feet or less from the pipeline. This extremely short distance, if proved, provides strong factual support for a conclusion that Kinder Morgan's discharge is covered under the CWA. *See Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1137, 1148–50 (10th Cir. 2005) (holding that a discharge that passed through a 2.5-mile tunnel between mine shaft and navigable water could be covered under CWA).

Also as a matter of undisputed fact, the ruptured pipeline caused the pollution at issue here. Kinder Morgan does not assert that the pollutants found in the creeks and wetlands have an independent or contributing cause. And this is not a case in which pollutants are diluted while passing through a labyrinth of underground "tunnel geology," *El Paso Gold Mines*, 421 F.3d at 1150, or are otherwise diverted from their natural course, *see Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45 (5th Cir. 1980) (holding that natural flow of "[g]ravity . . . resulting in a discharge into a navigable body of water,

---

[12] The Ninth Circuit has held that an indirect discharge must be "fairly traceable" from the point source to navigable waters. *Hawai'i Wildlife Fund,* 2018 WL 1569313, at *8 n.3. We see no functional difference between the Ninth Circuit's fairly traceable concept and the direct hydrological connection concept developed by EPA that we adopt today, which as we explain below includes a concept of traceability. In fact, the direct hydrological connection concept may be viewed as a narrower application of the same principle, addressing point source discharges *through ground water*.

may be part of a point source discharge if the [polluter] at least initially collected or channeled the water and other materials").

Additionally, the plaintiffs have alleged a traceable discharge from the ruptured pipeline. The traceability of a pollutant in measurable quantities is an important factor in the determination whether a particular discharge is covered by the CWA. *See Hawai'i Wildlife Fund,* 2018 WL 1569313, at *8 (holding that claim for indirect discharge must show that pollution is "fairly traceable" to the point source); *El Paso Gold Mines*, 421 F.3d at 1140 n.4 (noting that pollution that is "not traceable to a single, identifiable source or conveyance" is nonpoint source pollution). And Kinder Morgan does not dispute that pollutants originating from the gasoline pipeline *already* have been detected in the waters of Anderson County.

As we have noted, the CWA's stated purpose is "to restore . . . the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), and the statute establishes a regime of zero tolerance for unpermitted discharges of pollutants, 33 U.S.C. § 1311(a). In contrast, if the presence of a short distance of soil and ground water were enough to defeat a claim, polluters easily could avoid liability under the CWA by ensuring that all discharges pass through soil and ground water before reaching navigable waters. Such an outcome would greatly undermine the purpose of the Act. Thus, we hold that the plaintiffs plausibly have alleged a direct hydrological connection between the ground water and navigable waters to state a claim for a discharge of a pollutant under 33 U.S.C. § 1311(a).

25

We find no merit in Kinder Morgan's concern that our holding will result in unintended coverage under the CWA of any discharge of a pollutant into ground water. We do not hold that the CWA covers discharges to ground water itself. Instead, we hold only that an alleged discharge of pollutants, reaching navigable waters located 1000 feet or less from the point source by means of ground water with a direct hydrological connection to such navigable waters, falls within the scope of the CWA.[13] Accordingly, the plain language and purpose of the Clean Water Act direct our conclusion in the present case that the district court has jurisdiction to entertain the plaintiffs' claim under 33 U.S.C. § 1365(a), and that the plaintiffs have stated a claim for a violation of the Act's prohibition of the "discharge of any pollutant." 33 U.S.C. § 1311(a).

III.

For these reasons, we vacate the district court's decision and remand the case for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

---

[13] We also note that federal courts in several states, including some within this Circuit, have upheld in citizen suits the CWA's coverage of ground water-related discharges within those jurisdictions. *See, e.g.*, *Sierra Club v. Va. Elec. & Power Co.*, 247 F. Supp. 3d 753, 762 (E.D. Va. 2017); *Ohio Valley Envtl. Coal. Inc. v. Pocahontas Land Corp.*, 2015 WL 2144905, at *8 (S.D.W. Va. May 7, 2015); *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 445 (M.D.N.C. 2015); *see also Tenn. Riverkeeper v. Hensley-Graves Holdings, LLC*, No. 2:13-CV-877-LSC, at 13–18 (N.D. Ala. Aug. 20, 2013).

FLOYD, Circuit Judge, dissenting:

Based on allegations that pollutants are being added into navigable waters, the majority concludes that the Appellants have adequately alleged a cognizable and ongoing Clean Water Act ("CWA") violation.  Maj. Op. at 19.  While this conclusion may seem intuitive at first glance, close examination of the text, history, and structure of the CWA reveals that not every addition of pollution amounts to a CWA violation—much less an ongoing CWA violation.  Congress precisely defined a CWA violation as the addition of pollutants *from a point source*, and for there to be an ongoing CWA violation, there must be an ongoing addition of pollutants from a point source into navigable waters.  *See* 33 U.S.C. § 1362(12).  Here, the only point source at issue—Kinder Morgan's pipeline—has been repaired and is not currently adding any pollutants into navigable waters, thus negating a necessary element of a CWA violation.  Because there is no ongoing violation under the meaning of the CWA, I would affirm the district court's dismissal of the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  I respectfully dissent.

I.

A.

The parties' pleadings and briefs reveal the following facts.  In late 2014, residents of Belton, South Carolina, discovered that Kinder Morgan's pipeline released a large amount of gasoline and contaminated the nearby ground ("spill site").  Kinder Morgan repaired the pipeline within a few days of discovering the leak and began remediation

27

efforts that are ongoing to this day under the supervision of the South Carolina Department of Health and Environmental Control (DHEC). Kinder Morgan has recovered over 209,000 gallons of gasoline, but over 160,000 gallons of gasoline remain unrecovered at the spill site. Kinder Morgan's repaired pipeline is not currently leaking any additional gasoline. Nevertheless, as the gasoline from the spill site gets washed off by ground water or seeps through the ground from the spill site, gasoline is being introduced to navigable waters. In December 2016, the environmental groups Upstate Forever and Savannah Riverkeeper (collectively, "Appellants") initiated a citizen suit against Kinder Morgan, alleging an ongoing CWA violation. After full briefing on the matter, on April 20, 2017, the district court dismissed the Appellants' complaint for lack of subject matter jurisdiction and failure to state a claim.

### B.

We review a district court's order dismissing a complaint for lack of subject matter jurisdiction and for failure to state a claim *de novo*. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 505 (4th Cir. 2015). Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to move to dismiss a plaintiff's complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). To determine whether subject matter jurisdiction exists, courts are "to regard the pleadings' allegations as mere evidence . . . and may consider evidence outside of the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The nonmoving plaintiff bears the burden of proving subject matter jurisdiction, and "the moving party should prevail

only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

Rule 12(b)(6) allows a party to move to dismiss the plaintiff's complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). When a complaint is attacked by a Rule 12(b)(6) motion, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

## II.

Congress enacted the CWA, 33 U.S.C. § 1251 *et seq.*, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251. To accomplish these goals, Congress comprehensively reshaped the federal water regulatory scheme in various ways. *See EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 203–4 (1976).

First, Congress concentrated the federal regulatory effort on curtailing point source pollution—that is, pollution from "discernible, confined and discrete conveyance[s]," 33 U.S.C. § 1362(14)—"which tended to be more notorious and more easily targeted," *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 780 (9th Cir. 2008). Second, Congress established the National Pollution Discharge Elimination System (NPDES) which "requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." *S. Fla.*

29

*Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004). Third, Congress sought to ensure compliance by instituting an enforcement mechanism under which state and federal governments bear the primary responsibility for policing past and ongoing CWA violations, and private citizens provide supplementary enforcement for ongoing violations. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52–53, 58 (1987); *The Piney Run Preservation Ass'n v. The Cty. Comm'rs of Carroll Cty., Md.*, 523 F.3d 453, 456 (4th Cir. 2008).

While the CWA includes other important features, it bears explaining these three central features in detail, as they are critical to this appeal.

A.

In drafting the CWA, Congress focused the federal regulatory effort on reducing point source pollution by making the existence of, and the addition of pollutants from, a point source a *sine qua non* element of a CWA violation. The text and structure of the CWA unambiguously lead to this conclusion.

At the outset, it is important to note that "Congress consciously distinguished between point source and nonpoint source discharges." *Appalachian Power Co. v. Train*, 545 F.2d 1351, 1373 (4th Cir. 1976). Point source pollution is pollution from "any discernible, confined and discrete conveyance." 33 U.S.C. § 1362(14). The non-exhaustive list of examples of a point source in the CWA includes "pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft." *Id.* All other sources of pollution—namely, those that are not "discernible, confined and discrete," *id.*—are considered

nonpoint sources. *Or. Nat. Desert Ass'n*, 550 F.3d at 780. In other words, nonpoint source pollution "is defined by exclusion and includes all water quality problems" that are not from a point source. *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 166 (D.C. Cir. 1982).

Unlike point source pollution, nonpoint source pollution "arises from many dispersed activities over large areas, and is not traceable to any single discrete source." *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1183 (9th Cir. 2002). "Congress had classified nonpoint source pollution as runoff caused primarily by rainfall around activities that employ or create pollutants." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 220 (2d Cir. 2009) (internal quotation marks omitted). Indeed, a common example of nonpoint source pollution is rain washing pollution off the highway and carrying it along "by runoff in a polluted soup[] [to] creeks, rivers, bays, and the ocean." *Forsgren*, 309 F.3d at 1183. The EPA guidance on nonpoint source pollution similarly confirms that "[i]n practical terms, nonpoint source pollution does not result from a discharge at a specific, single location (such as a single pipe) but generally results from land runoff, precipitation, atmospheric deposition, or percolation." *Cordiano*, 575 F.3d at 220 (quoting EPA Office of Water, *Nonpoint Source Guidance* 3 (1987)).

That Congress intended to target point source pollution, rather than nonpoint source pollution, is evident from the text of the CWA, which makes the existence of a point source a required element of a CWA violation. 33 U.S.C. § 1311(a) provides that "[e]xcept as in compliance with [the various section in the CWA], the discharge of any

31

pollutant by any person shall be unlawful." "Discharge of a pollutant" is a term of art under the CWA, with a more precise meaning than under ordinary parlance. *Cf. Burgess v. United States*, 553 U.S. 124, 129 (2008) ("Statutory definitions control the meaning of statutory words . . . in the usual case." (internal quotation marks omitted)). Congress defined "discharge of a pollutant" as "any addition of any pollutant to navigable waters *from any point source*." 33 U.S.C. § 1362(12) (emphasis added).

In summarizing the requirements under these two statutory provisions, 33 U.S.C. §§ 1311(a), 1362(12), courts have consistently restated the elements of a CWA violation as "(1) discharg[ing] (2) a pollutant (3) into navigable waters (4) *from a point source* (5) without a [NPDES] permit." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1142 (10th Cir. 2005) (emphasis added); *see also Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004); *Comm. To Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 309 (9th Cir. 1993); *Nat'l Wildlife Fed'n v. Consumer Power Co.*, 862 F.2d 580, 583 (6th Cir. 1988) ("[F]or NPDES requirements to apply to any given set of circumstances, 'five elements must be present: (1) a *pollutant* must be (2) *added* (3) *to navigable waters* (4) *from* (5) a *point source*.'" (quoting *Gorsuch*, 693 F.2d at 165)); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir. 1983). The "point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters[.] . . .'" *Miccosukee Tribe*, 541 U.S. at 105. For there to be a conveyance or "addition" of pollutants under the meaning of the CWA, "a 'point source must *introduce* the pollutant into navigable water from the outside world[,]' . . . [that is,] any place outside the particular body of water to which pollutants

32

are introduced." *Catskill Mts. Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 491 (2d Cir. 2001) (quoting *Gorsuch*, 693 F.2d at 165). As these definitions unambiguously show, a critical element of a CWA violation is that the pollutant comes from a point source.

Furthermore, the general structure of the CWA confirms that Congress sought to focus on point source pollution. "A central provision of the [CWA] is its requirement that individuals, corporations, and governments secure [NPDES] permits before discharging pollution from any point source into the navigable waters . . ." *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 602 (2013). Under the CWA, point source pollution is regulated by the EPA through the NPDES permitting program, *see* 33 U.S.C. § 1342, and nonpoint source pollution is regulated by the states, *see* 33 U.S.C. § 1329; *Cordiano*, 575 F.3d at 219–220; *Gorsuch*, 693 F.2d at 165–66. Based on this structure, courts have consistently recognized that "nonpoint sources of pollution have not generally been targeted by the CWA . . . ." *Or. Nat. Desert Ass'n*, 550 F.3d at 785. In drafting the CWA, "[w]hile Congress could have defined a 'discharge' to include generalized runoff, . . . it chose to limit the permit program's application to the . . . [point source] category." *Id.* (quoting William L. Andreen, *Water Quality Today—Has the Clean Water Act Been A Success?*, 55 Ala. L. Rev. 537, 562 (2004)). In sum, the fact that "the [CWA] assigns the primary responsibility for regulating point sources to the EPA and nonpoint sources to the states," *Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 299 (3d Cir. 2015), plainly shows that Congress's main focus in enacting the CWA was the reduction of point source pollution.

33

A careful review of the CWA's text and structure reveals that Congress sought to target point source pollution and thus included point source as an indispensable element of a CWA violation.[1]

B.

Congress chose the NPDES permitting program as a central means of controlling point source pollution. "[I]ndividuals, corporations, and governments [must] secure [NPDES] permit[s] before discharging pollution from any point source into the navigable waters of the United States." *Decker*, 568 U.S. at 602.

Under the CWA, the state and federal governments act as partners in administering the NPDES program and issuing the permits. *Arkansas v. Oklahoma*, 503

---

[1] While the text and structure speak unambiguously, for those who may find legislative history persuasive, the CWA's legislative history similarly confirms Congress's focus on point source pollution. Congress added the term "point source" "as a means of identifying industrial polluters" to narrow and clarify the scope of the CWA. *United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 647 (2d Cir. 1993). The Senate Report for the CWA explains:

> In order to further clarify the scope of the regulatory procedures in the Act [sic] the Committee has added a definition of point source to distinguish between control requirements where there are specific confined conveyances, such as pipes, and control requirements which are imposed to control runoff. The control of pollutants from runoff is applied pursuant to Section 209 and the authority resides in the State or local agency.

S. Rep. No. 92-414 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 3744. The narrowing of Congress's regulatory focus resulted "in part because nonpoint sources were far more numerous and more technologically difficult to regulate," whereas "point sources . . . tended to be more notorious and more easily targeted." *Or. Nat. Def. Ass'n*, 550 F.3d at 780; *see also* S. Rep. No. 92-414, at 39 ("[M]any nonpoint sources of pollution are beyond present technology of control"). Whatever the reason, the legislative history confirms that Congress intended to focus on point source pollution in enacting the CWA.

U.S. 91, 101 (1992). An NPDES permit can be issued by either the EPA or a state agency. The EPA "initially administers the NPDES permitting system for each State, but a State may apply for a transfer of permitting authority to state officials." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 650 (2007). "If authority is transferred, then state officials—not the federal EPA—have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight." *Id.*

An NPDES permit "place[s] limits on the type and quantity of pollutants that can be released into the Nation's waters," *Miccosukee Tribe*, 541 U.S. at 102, and "defines, and facilitates compliance with, and enforcement of, . . . a discharger's obligations under the [CWA]," *California ex rel. State Water Res. Control Bd.*, 426 U.S. at 205. The EPA promulgates the "effluent limitations" that "restrict the quantities, rates, and concentrations of specified substances which are discharged." *Arkansas*, 503 U.S. at 101; *see also* 33 U.S.C. §§ 1311, 1314. The states, with substantial guidance from EPA, promulgate the "water quality standards" that express the states' "desired condition of a waterway . . . so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." *Id.* (internal quotation marks); *see also* 33 U.S.C. § 1313. In addition to listing the effluent limitations and water quality standards, NPDES permits also require "compliance with the inspection, reporting and monitoring requirements of the [CWA] as outlined in 33 U.S.C. § 1318." *Menzel v. Cty. Util. Corp.*, 712 F.2d 91, 94 (4th Cir. 1983). To the benefit of NPDES permit holders, the CWA "shields NPDES permit holders from liability if their discharges comply with their permits." *Ohio Valley Envtl.*

35

*Coal. v. Fola Coal Co., LLC*, 845 F.3d 133, 135 (4th Cir. 2017). The NPDES permitting scheme thus constitutes "[t]he primary means for enforcing these limitations and standards." *Arkansas*, 503 U.S. at 101.

NPDES permitting is, however, not only ill-equipped to address, but also inapplicable to, nonpoint source pollution. Unlike a point source, nonpoint source pollution "arises from many dispersed activities over large areas, and is not traceable to any single discrete source." *Forsgren*, 309 F.3d at 1184. And for that reason, nonpoint source pollution "is very difficult to regulate through individual permits." *Id.* More specifically, it would be difficult to mandate compliance with inspection, reporting, and monitoring requirements given that nonpoint source pollution cannot be traced to discrete sources. Thus, sensibly, the CWA does not attempt to regulate nonpoint source pollution through the NPDES permitting. *See El Paso*, 421 F.3d at 1140 n.4 (observing that "[g]roundwater seepage that travels through fractured rock would be nonpoint source pollution, which is not subject to NPDES permitting"); *Forsgren*, 309 F.3d at 1183 (stating that nonpoint source pollution "is regulated in a different way and does not require [an NPDES] permit); *Gorsuch*, 693 F.2d at 166 (accepting the EPA's explanation of the CWA that nonpoint source pollution "includes all water quality problems not subject to § 402 [NPDES permit program]").

In sum, Congress chose the NPDES permitting scheme as the primary means of controlling point source pollution, which is the focus of the CWA regulatory scheme.

## C.

Congress also instituted a comprehensive enforcement scheme to ensure compliance with the CWA, in which the state and federal governments bear the primary responsibility for enforcement, but private citizens have limited supplementary enforcement authority.

Under the CWA, "the primary responsibility for enforcement rests with the state and federal governments . . . ." *The Piney Run*, 523 F.3d at 456 (quoting *Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs*, 504 F.3d 634, 637 (6th Cir. 2007)). 33 U.S.C. § 1319 vests the EPA with a broad range of enforcement tools—criminal, civil, and administrative. *See, e.g.*, *Sackett v. EPA*, 566 U.S. 120, 122 (2012) ("If the EPA determines that any person is in violation of [the CWA], the Act directs the agency either to issue a compliance order or to initiate a civil enforcement action."); *United States v. Schallom*, 998 F.2d 196, 198 (4th Cir. 1993) (per curiam) (affirming a criminal conviction for discharging pollutants without a permit in violation of 33 U.S.C. § 1319(c)(2)). The EPA may initiate administrative and civil proceedings for both present and past CWA violations. *See Gwaltney*, 484 U.S. at 58.

The CWA also includes a citizen suit provision, 33 U.S.C. § 1365(a), under which "private citizens provide a second level of enforcement and can serve as a check to ensure the state and federal governments are diligent in prosecuting [CWA] violations." *The Piney Run*, 523 F.3d at 456 (quoting *Hamilton Cty. Bd. of Cty. Comm'rs*, 504 F.3d at 637). Under the citizen suit provision, "any citizen may commence a civil action . . . against any person . . . who is alleged to be in violation of" the CWA. 33 U.S.C.

37

§ 1365(a)(1). However, "the citizen suit is meant to supplement rather than to supplant governmental action," *Gwaltney*, 484 U.S. at 60, and, therefore, Congress limited a citizen's ability to enforce the CWA in various ways.[2]

One important jurisdictional limit on a citizen's ability to enforce the CWA is that she may only bring a suit for an *ongoing* CWA violation but not for a *past* violation. *Id.* at 57. The text of the CWA authorizes a citizen suit only against someone "alleged to be in violation of" the CWA. 33 U.S.C. § 1365(a)(1). The Supreme Court concluded that "[t]he most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either *continuous* or *intermittent* violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney*, 484 U.S. at 57 (emphasis added). The *Gwaltney* Court further stated that "Congress could have phrased its requirement in language that looked to the past ('to have violated'), but it did not choose this readily available option." *Id.* In other words, Congress did not authorize a citizen to enforce the CWA for "wholly past violations." *Id.*. The Supreme Court observed that allowing citizens to pursue wholly past violations "could undermine the

---

[2] A citizen invoking the CWA citizen suit provision must first show that she has Article III and statutory standing to bring the suit. *See* 33 U.S.C. § 1365(g); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 152 (4th Cir. 2000) (en banc). Moreover, the citizen may not commence suit prior to 60 days after giving notice of the alleged violation to the appropriate governmental authority and the alleged polluter. 33 U.S.C. § 1365(b)(1)(A). Lastly, 33 U.S.C. § 1365(b)(1)(B) "bars a citizen from suing if the EPA or the State has already commenced, and is 'diligently prosecuting,' an enforcement action." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 175 (2000). Congress instituted these restrictions on the CWA citizen suit provision "to strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits." *Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 29 (1989).

supplementary role envisioned for the citizen suit." *Id.* at 60. Thus, a citizen seeking to commence a citizen suit "must show that the defendant's violations of the CWA are ongoing at the time of suit." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 521 (4th Cir. 2003).

Therefore, although Congress envisioned private citizens playing an important role in the CWA enforcement by providing supplementary enforcement, it also placed jurisdictional limitations on citizen suits by requiring the existence of an ongoing violation.

### III.

The threshold jurisdictional question in this appeal is whether there is a cognizable and ongoing CWA violation such that the Appellants' citizen suit may proceed. *See Gwaltney*, 484 U.S. at 57. In my view, the Appellants have failed to show that the CWA violation is ongoing, because there is no ongoing discharge of pollutants from a point source. *Cf. Am. Canoe Ass'n*, 326 F.3d at 521. Instead, the facts presented to us in the record demonstrate that there is an ongoing groundwater migration from the spill site, which does not amount to a CWA violation and cannot support a citizen suit. *See Or. Nat. Desert Ass'n*, 550 F.3d at 785 (noting that Congress chose not to include generalized runoff within the definition of "discharge").

A.

In my view, there is no ongoing CWA violation. The Appellants cannot show that there is an ongoing discharge of pollutants from a point source, because the only point source at issue—the pipeline—is not currently leaking or releasing any pollutants.

A CWA violation is defined as an unpermitted "discharge of any pollutant by any person." 33 U.S.C. § 1311(a). "Discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). For there to be an "addition . . . from a point source," *id.*, the point source must convey, transport, or introduce the pollutant to navigable waters. *See Miccosukee Tribe*, 541 U.S. at 105 (observing that "a point source . . . need only convey the pollutant to 'navigable waters' " and that the examples of point sources in 33 U.S.C. § 1362(12) are objects that "transport" pollutants); *Catskill Mts.*, 273 F.3d at 491 ("[A] 'point source must *introduce* the pollutant into navigable water from the outside world.' " (quoting *Gorsuch*, 693 F.2d at 165)). In other words, to constitute a CWA violation, a point source must have been involved in the discharging activity.

Thus, for there to be an *ongoing* CWA violation, a point source must currently be involved in the discharging activity by adding, conveying, transporting, or introducing pollutants to navigable waters. *See El Paso Gold Mines*, 421 F.3d at 1140 (summarizing the "ongoing migration cases" in which there was "an identifiable discharge from a point source that *occurred in the past* . . . ," but "[a]t the time of suit, the discharging activity *from a point source* . . . had ceased," and citizen suits were dismissed). The majority notes that "[t]he CWA's language does not require that the point source continue to

40

release a pollutant for a violation to be ongoing." Maj. Op. at 16. It is difficult to see how there could be an ongoing CWA violation—defined as "any addition of pollutants . . . from any point source"—without an ongoing discharging activity from a point source. In my view, to constitute an ongoing CWA violation (i.e. ongoing point source pollution), the point source's discharging, adding, conveying, transporting, or introducing of pollutants must be continuous.

Kinder Morgan's pipeline is not presently leaking or releasing gasoline; therefore, the only relevant point source is not currently discharging—adding, conveying, transporting, or introducing—pollutants to navigable waters. *Cf. Miccosukee Tribe*, 541 U.S. at 105; *Catskill Mts.*, 273 F.3d at 491. Thus, in my view, there is no ongoing violation under the meaning of the CWA. This should therefore end the Appellants' citizen suit, which requires an ongoing CWA violation. *See* 33 U.S.C. §§ 1362(12); 1365(a); *Gwaltney*, 484 U.S. at 57. The majority also seemingly recognizes that pollutants must be actively "*originating* from a point source." Maj. Op. at 17 (emphasis added). However, the majority's theory is that since the pollutants in the spill site *once came* from the pipeline, the continuing addition from the spill site is thus a continuing discharge from a point source. But accepting this position would effectively erase the phrase *from any point source* out of the CWA, 33 U.S.C. § 1362(12), and find an ongoing CWA violation even though no pollutant is originating or being added from a point source any longer. Thus, in my view, the majority disregards point source as an element of a CWA violation and invents a violation not cognizable under the CWA.

41

Because the pipeline is not actively and continuously discharging pollutants, there is no ongoing violation, but only a wholly past violation, under the meaning of the CWA.

## B.

In my view, this is an ongoing migration case, which does not amount to an ongoing CWA violation and cannot support a citizen suit. Kinder Morgan is a past violator—that is, it indirectly added pollutants to navigable waters from its point source when its pipeline leaked and released a large amount of gasoline that reached navigable waters. Although Kinder Morgan's pipeline itself is not currently leaking, the effects of Kinder Morgan's past violation continue. The spill site continues to introduce gasoline into navigable waters as gasoline migrates through the ground or as ground water washes off and carries gasoline to navigable waters. This Court has not addressed whether a past discharge with lasting effects—through an ongoing migration of pollutants through groundwater movement—can support a citizen suit. *See Ohio Valley Envtl. Coal., Inc. v. Hernshaw Partners, LLC*, 984 F. Supp. 2d 589, 597 (S.D. W. Va. 2013) (observing there is no Fourth Circuit precedent directly on point).

Given similar circumstances, however, several federal courts have concluded that ongoing migration of pollutants from a past discharge does not amount to an ongoing discharge necessary to support a citizen suit under the CWA. *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1312–13 (2d Cir. 1993) (finding no ongoing CWA violation because the alleged polluter had "ceased operation of the Gun Club" that deposited lead shot and clay target debris into navigable waters "by the time plaintiff filed suit"); *Pawtuxet Cove Marina v. Ciba-Geigy Corp.*, 807 F.2d 1089, 1094

42

(1st Cir. 1986) (finding no ongoing CWA violation because "[a]t the time plaintiffs brought suit, . . . defendant had ceased operating"); *Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 397 (5th Cir. 1985) (finding no ongoing CWA violation because "the complaint alleges . . . only that there are continuing *effects* from the past discharge, and such an allegation is insufficient for the purposes of section 1365."); *Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81, 120–21 (E.D.N.Y. 2001) (concluding that the ongoing migration of residual leachate plume from a past violation is not an ongoing CWA violation), *Wilson v. Amoco Corp.*, 33 F. Supp. 2d 969, 975–76 (D. Wyo. 1998); *Friends of Santa Fe Cty. v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1354 (D.N.M. 1995) ("Migration of residual contamination resulting from previous releases is not an ongoing discharge within the meaning of the Act."); *Brewer v. Ravan*, 680 F. Supp. 1176, 1183 (M.D. Tenn. 1988); *cf. El Paso*, 421 F.3d at 1140.

Like those courts, I would conclude that the lasting effects of Kinder Morgan's past violation cannot give rise to a citizen suit under the CWA for two reasons. First, ongoing migration does not involve a point source, thus negating an essential element of a CWA violation. Second, ongoing migration is, by definition, nonpoint source pollution, which is outside of the CWA's reach.

i.

Ongoing migration from a site contaminated by a past discharge does not involve a point source and is thus not a cognizable violation under the CWA. *See* 33 U.S.C. § 1362(12). Indeed, the lack of a discharging activity from a point source was the

43

decisive factor for many courts in concluding that ongoing migration cannot support a CWA citizen suit. As the Tenth Circuit has summarized:

> The ongoing migration cases [in which the courts dismissed the citizen suits] . . . all involve an identifiable discharge from a point source that *occurred in the past*, whether it be a spill, *Wilson*, 989 F. Supp. at 1163, the accidental leakage at a chemical plant, *Hamker*, 756 F.2d at 394, the discharge of lead shot and clay targets at a firing range, *Remington Arms*, 989 F.2d at 1309, or dumping of waste rock at a mine, *LAC Minerals*, 892 F. Supp. at 1337. At the time of suit, the discharging activity *from a point source* in all of these cases had ceased; all that remained was the migration, decomposition, or diffusion of the pollutants into a waterway.

*El Paso*, 421 F.3d at 1140. Likewise, at the time of the Appellants' suit, the discharging activity from Kinder Morgan's point source (i.e., the gasoline leak) had ceased, and all that remained was migration of gasoline from the spill site to navigable waters. "Migration of residual contamination resulting from previous releases is not an ongoing discharge within the meaning of the [CWA]," *LAC Minerals*, 892 F. Supp. at 1354, because the point source itself is not conveying or introducing a pollutant into navigable waters, *see Miccosukee Tribe*, 541 U.S. at 105; *Gorsuch*, 693 F.2d at 175.

The majority attempts to distinguish one of these migration cases from the Fifth Circuit, *Hamker*, 756 F.2d at 397, by observing that *Hamker* only dealt with an alleged discharge into groundwater and not navigable waters. *See* Maj. Op. at 19. But the court's analysis in *Hamker* did not turn on the issue of navigable waters; rather, it turned on the fact that the continuing addition of pollutants did not come from any point source. *Hamker*, 756 F.2d at 397. The majority further states in a footnote that "to the extent that *Hamker*'s reasoning suggests that an ongoing violation requires that the point source continually discharge a pollutant, *Hamker* contravenes our decision in *Goldfarb*." Maj.

44

Op. at 19 n.9.  The majority misplaces reliance on *Goldfarb*.  This Court in *Goldfarb* observed that, under the Resource Conservation and Recovery Act's (RCRA) citizen suit provision, 42 U.S.C. § 6972(a)(1)(A), "although a defendant's *conduct* that is causing a *violation* may have ceased in the past . . . what is relevant is that the *violation* is continuous or ongoing."  *Goldfarb*, 791 F.3d at 513.  The statement in *Goldfarb* presumes that there already is an ongoing violation, does not help us in determining whether a polluter's past action with lasting effects should be viewed as past or ongoing violation, and is inapplicable to Kinder Morgan's situation because Kinder Morgan's CWA violation had ceased when its point source ceased discharging pollutants.

ii.

Moreover, migration of pollutants from the spill site amounts to an ongoing nonpoint source pollution.  As discussed above, Congress chose not to regulate nonpoint source pollution through the NPDES permitting program.  *See, e.g.*, *El Paso*, 421 F.3d at 1140 n.4; *Forsgren*, 309 F.3d at 1183; *Gorsuch*, 693 F.2d at 166; *Appalachian Power*, 545 F.2d at 1373–74.  Nonpoint source pollution is commonly caused by the natural movements of rainfall or groundwater that wash off and carry pollutants from a large, diffuse area to navigable waters.  *Codiano*, 575 F.3d at 220 ("[N]onpoint source pollution . . . generally results from land runoff, precipitation, atmospheric deposition, or percolation."); *El Paso*, 421 F.3d at 1140 n.4 ("Groundwater seepage that travels through fractured rock would be nonpoint source pollution, which is not subject to NPDES permitting."); *Sierra Club v. Abston Constr. Co., Inc.*, 620 F.2d 41, 44 (5th Cir. 1980) ("The focus of [the CWA] is on the 'discernible, confined and discrete' conveyance of

45

the pollutant, which would exclude natural rainfall drainage over a broad area."); *Tr. for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984) ("Congress had classified nonpoint source pollution as runoff caused primarily by rainfall around activities that employ or create pollutants."). Nonpoint source pollution—caused by movements of rain or groundwater—"is very difficult to regulate through individual [NPDES] permits" because it "arises from many dispersed activities over large areas, and is not traceable to any single discrete source." *Forsgren*, 309 F.3d at 1184.

Here, the Appellants have alleged ongoing migration from the spill site, which does not amount to a CWA violation. The Appellants have alleged that the groundwater flow from the spill site is introducing pollutants to navigable waters. Appendix ("App.") 8. Indeed, the Appellants' CWA case is built on the novel theory that the introduction of pollutants through the movement of hydrologically connected *groundwater* amounted to a CWA violation. Appellant Br. 26. As the record plainly shows, groundwater is carrying gasoline from the spill site, which spans in three different directions from the pipeline and covers a vast area. App. 99, 173. This kind of migration of pollutants through the natural movements of groundwater amounts to nonpoint source pollution. *El Paso*, 421 F.3d at 1140 n.4; *see also Forsgren*, 309 F.3d at 1184. While there is no doubt this kind of nonpoint source pollution affects the quality navigable waters, Congress deliberately chose not to place nonpoint source pollution within the CWA's reach.[3] *See,*

---

[3] An exception to this general rule is that the "[g]ravity flow, resulting in a discharge into a navigable body of water, may be part of a point source discharge if the [polluter] at least initially collected or channeled the water and other materials." *Abston* (Continued)

*e.g.*, *Abston Constr.*, 620 F.2d at 44.  In my view, therefore, because ongoing migration of pollutants is nonpoint source pollution, it is not cognizable under the CWA.

In sum, I would conclude that ongoing migration of pollutants from a past discharge does not amount to an ongoing CWA violation.

## C.

I do not take lightly the allegations of the severe environmental harm caused by Kinder Morgan.  The Appellants have alleged facts suggesting a serious environmental disaster that cannot be easily overlooked as a mere peccadillo on the part of Kinder Morgan's operation and management.  The allegations indicate that a full restoration will take many years and require tremendous resources.

The severity of the situation alone, however, does not and cannot give rise to a citizen suit under the CWA.  "Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  In creating a citizen suit provision under the CWA, Congress deliberately limited federal courts' jurisdiction such that they may entertain citizen suits only for allegations of ongoing CWA violations.  33 U.S.C. §

---

*Contr.*, 620 F.2d at 45.  This is because, once a polluter attempts to channel, collect, or otherwise redirect the flow of water, such an effort becomes a "discernible, confined and discrete" conveyance.  33 U.S.C. § 1362(14); *see also Sierra Club v. Va. Elec. Power Co.*, 247 F. Supp. 3d 753, 763 (E.D. Va. 2017) ("Dominion built the piles and ponds to concentrate [pollutants] in one location . . . [which] channels and conveys [pollutants] directly into groundwater and thence into the surface waters.  Essentially they are discrete mechanisms . . . . ").  The Appellants have not alleged that Kinder Morgan has at all attempted to channel, collect, or redirect the free flow of groundwater.  *See* App. 419.

47

1365(a); *Gwaltney*, 484 U.S. at 57. And Congress precisely defined a CWA violation as a point source discharge without an NPDES permit. The critical element—the addition from a point source—cannot be satisfied here because Kinder Morgan has repaired its pipeline and the pipeline is not currently leaking or adding pollutants to navigable waters. The Appellants can only point to nonpoint pollution from the spill site or the past violation, which cannot give rise to a citizen suit under the CWA.

Barring the Appellants' citizen suit would not necessarily mean that Kinder Morgan will evade accountability. Under the CWA, the primary responsibility for enforcement rests with the state and federal governments. *The Piney Run*, 523 F.3d at 456. In fact, the State of South Carolina, through DHEC, has stepped in and is actively overseeing the remediation efforts. DHEC has directed Kinder Morgan to investigate the impact of the spill and implement corrective action plans. After a series of back and forth revisions between DHEC and Kinder Morgan, on March 1, 2017, DHEC approved the "Startup Plan for Surface Water Protection Measures" that was meant to implement additional remedial measures in the spill site. App. 351. Thus, even without a CWA citizen suit, the State of South Carolina is protecting and remediating the waters and natural resources within its borders. In addition to ordering Kinder Morgan to remediate the spill site, the state and federal governments are also empowered to use criminal, civil, and administrative enforcement actions for even for *past* violations of the CWA.

Moreover, if a CWA citizen suit fails for lack of subject matter jurisdiction, other state and federal laws may provide actionable claims against Kinder Morgan. South Carolina state law may provide a more encompassing response. As the *amici* States have

pointed out, Brief of the *Amici* States 22–23, South Carolina law provides for the state to recover monetarily from polluters for violations that includes even nonpoint source pollution, *see* S.C. Code § 48-1-90(a)(1). In addition to the enforcement mechanism under state law, other federal laws could provide recourse. In response to Kinder Morgan's past spill, a federal citizen suit may perhaps be more appropriate under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*, which is "designed to effectuate the cleanup of toxic waste sites" and to impose cleanup costs, *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (citations omitted), or under the RCRA, 42 U.S.C. § 6901 *et seq.*, which concerns with the disposal of hazardous waste, *Aiello*, 136 F. Supp. 2d at 121 ("It is RCRA, rather than the CWA, that appropriately addresses liability for ongoing contamination by past polluters.").

The Appellants have raised serious allegations but, in my view, the CWA citizen suit is not the proper mechanism to seek redress. Therefore, the district court lacked subject matter jurisdiction and the complaint failed to state a claim upon which relief can be granted.

IV.

For the reasons above, I would affirm the district court's dismissal of the Appellants' complaint. I respectfully dissent.

49